# EXHIBIT 1(A)

In the Superior Court of the State of Arizona
Ir _____ MARICOPA __

# CV2018-053331

## CIVIL COVER SHEET- NEW FILING ONLY
(Please Type or Print)

Is Interpreter Needed?  ☐ Yes  ☒ No
If yes, what language:

CHRIS DEROSE, CLERK
L. COOPER, FILED
18 OCT -1  PM 4: 2

Plaintiff's Attorney  DAVID L. KURTZ

Attorney Bar Number  007433

Plaintiff's Name(s): (List all)     Plaintiff's Address:     Phone #:     Email Address:
DAVID L. KURTZ, individually, and as President of DAVID L. KURTZ, P.C. dba THE KURTZ LAW FIRM

7420 E. Pinnacle Peak Rd., #128, Scottsdale, AZ 85255, (480) 585-1900, dkurtz@kurtzlaw.com

(List additional Plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)
THE GOODYEAR TIRE & RUBBER COMPANY

(List additional Defendants on page two and/or attach a separate sheet)

## NATURE OF ACTION

(Place an "X" next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**
☐101 Non-Death/Personal Injury
☐102 Property Damage
☐103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**
☐111 Negligence
☐112 Product Liability – Asbestos
☐112 Product Liability – Tobacco
☐112 Product Liability – Toxic/Other
☒113 Intentional Tort

☐114 Property Damage
☐115 Legal Malpractice
☐115 Malpractice – Other professional
☐117 Premises Liability
☐118 Slander/Libel/Defamation
☐116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**
☐121 Physician M.D.    ☐123 Hospital
☐122 Physician D.O    ☐124 Other

**130 CONTRACTS:**
☐131 Account (Open or Stated)
☐132 Promissory Note
☐133 Foreclosure
☐138 Buyer-Plaintiff
☐139 Fraud
☐134 Other Contract (i.e. Breach of Contract)
☐135 Excess Proceeds-Sale
☐Construction Defects (Residential/Commercial)
　　☐136 Six to Nineteen Structures
　　☐137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**
☐156 Eminent Domain/Condemnation
☐151 Eviction Actions (Forcible and Special Detainers)
☐152 Change of Name
☐153 Transcript of Judgment
☐154 Foreign Judgment
☐158 Quiet Title
☐160 Forfeiture
☐175 Election Challenge
☐179 NCC-Employer Sanction Action
　　(A.R.S. §23-212)

©Superior Court of Arizona in Maricopa County    Page 1 of 2    CV10f – 070118
ALL RIGHTS RESERVED

Case No._____

☐ 180 Injunction against Workplace Harassment
☐ 181 Injunction against Harassment
☐ 182 Civil Penalty
☐ 186 Water Rights (Not General Stream Adjudication)
☐ 187 Real Property
☐ Special Action against Lower Courts
    (See Lower Court Appeal cover sheet in Maricopa)
☐ 194 Immigration Enforcement Challenge
    (A.R.S. §§1-501, 1-502, 11-1051)

**160-199 UNCLASSIFIED CIVIL:**

☐ Administrative Review
    (See Lower Court Appeal cover sheet in Maricopa)
☐ 150 Tax Appeal
    (All other tax matters must be filed in the AZ Tax
    Court)
☐ 155 Declaratory Judgment
☐ 157 Habeas Corpus
☐ 184 Landlord Tenant Dispute- Other
☐ 190 Declaration of Factual Innocence
    (A.R.S. §12-771)

☐ 191 Declaration of Factual Improper Party Status
☐ 193 Vulnerable Adult (A.R.S. §46-451)
☐ 165 Tribal Judgment
☐ 167 Structured Settlement (A.R.S. §12-2901)
☐ 169 Attorney Conservatorships (State Bar)
☐ 170 Unauthorized Practice of Law (State Bar)
☐ 171 Out-of-State Deposition for Foreign Jurisdiction
☐ 172 Secure Attendance of Prisoner
☐ 173 Assurance of Discontinuance
☐ 174 In-State Deposition for Foreign Jurisdiction
☐ 176 Eminent Domain– Light Rail Only
☐ 177 Interpleader– Automobile Only
☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
☐ 183 Employment Dispute- Discrimination
☐ 185 Employment Dispute-Other
☐ 196 Verified Rule 45.2 Petition
☐ 195(a) Amendment of Marriage License
☐ 195(b) Amendment of Birth Certificate
☐ 163 Other _____
            (Specify)

## RULE 26.2 DISCOVERY TIER or AMOUNT PLEADED:

(State the amount in controversy pleaded or place an "X" next to the discovery tier to which the pleadings allege the case would belong under Rule 26.2.)

☒ Amount Pleaded $ _not specified_____   ☐ Tier 1   ☐ Tier 2   ☒ Tier 3

## EMERGENCY ORDER SOUGHT

☐ Temporary Restraining Order   ☐ Provisional Remedy   ☐ OSC   ☐ Election Challenge
☐ Employer Sanction   ☐ Other (Specify) _____

## COMMERCIAL COURT (Maricopa County Only)

☐ This case is eligible for the Commercial Court under Rule 8.1, and Plaintiff requests assignment of this case to the commercial Court. More information on the commercial Court, including the most recent forms, are available on the Court's website at https://www.superiorcourt.maricopa.gov/commercial-court/.

**Additional Plaintiff(s):**

_____

_____

**Additional Defendant(s):**

_____

_____

©Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED
CV10f - 070118

# EXHIBIT 1(B)



CHRIS DEROSE
Clerk of the Superior Court
By Lisa Cooper, Deputy
Date 10/01/2018 Time 16:29:53
Description                    Amount
------- CASE# CV2018-053331 -------
CIVIL NEW COMPLAINT            333.00

TOTAL AMOUNT                   333.00
        Receipt# 26830312

David L. Kurtz - 007433
dkurtz@kurtzlaw.com
**THE KURTZ LAW FIRM**
7420 East Pinnacle Peak Road, Suite 128
Scottsdale, Arizona 85255
Telephone: (480) 585-1900

Attorneys for Plaintiff

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

DAVID L. KURTZ, individually and as President of DAVID L. KURTZ, P.C. doing business as THE KURTZ LAW FIRM,

Plaintiff,

vs.

THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation,

Defendant.

No. CV2018-053331

**COMPLAINT**
(Fraudulent Misrepresentation, Fraudulent Non-Disclosure, Fraudulent Concealment, Abuse of Process, Aiding and Abetting)

Plaintiff, through its counsel undersigned, for his complaint and causes of action alleges as follows:

**I.    PARTIES**

1.    David L. Kurtz is and has been a resident at all material times in Maricopa County, Arizona. David L. Kurtz has been employed by David L. Kurtz, P.C. since 1999, as an attorney duly licensed in Arizona and also serves as the President of David L. Kurtz, P.C.

2.    David L. Kurtz, P.C. was formed in 1999 and at all material times has done business in Maricopa County, Arizona. David L. Kurtz, P.C. does business as The Kurtz Law Firm.

3.    Defendant Goodyear Tire & Rubber Company ("Goodyear") is an Ohio corporation which does business throughout the United States, including Maricopa County, Arizona. Defendant Goodyear's acts and omissions caused events to occur in Maricopa County which are the subject of this Complaint.

1    4.    The acts described hereafter were undertaken by Goodyear through its
2 authorized agents in the scope of and in furtherance of their employment with
3 Goodyear and its business interests.

4    5.    Goodyear's relevant employees include its General Counsel, Associate
5 General Counsel, all other members of its Legal Department, Richard Kramer in
6 various capacities, its past and current Board of Directors, Goodyear Corporate
7 Safety Committee members, Goodyear Manager of Government Compliance and
8 Product Performance, and Goodyear's Manager of Global Regulations, Standards and
9 Compliance.

10    6.    Goodyear's agents include its outside counsel involved in relevant G159
11 tire litigation cases and outside counsel involved in evaluating, advising and
12 implementing Goodyear decisions relating to defect determinations, reporting,
13 concealing and implementing Goodyear deceptions relating to the G159 tire.

14    7.    Goodyear authorized each of the acts and omissions of its authorized
15 agents and employees.

16    8.    Goodyear ratified each of the acts and omissions of its authorized
17 agents and employees.

18 **II.    STATEMENT OF FACTS**

19    7.    In June 2003 the Haeger family was traveling along Interstate 25 on a
20 New Mexico freeway in the family's 38-foot motorhome when the right front tire
21 failed as the result of a tread separation.   The tires on the motorhome were all
22 Goodyear G159 275/70R22.5 tires (G159).    The sudden failure caused the
23 motorhome to veer violently to the right off the freeway and crash.

24    8.    The accident caused serious and permanent injuries to the occupants of
25 the vehicle, LeRoy Haeger, his wife Donna Haeger, his son Barry Haeger and his wife
26 Suzanne Haeger.

27

28

Complaint                                    - 2 -

9.     The G159 was designed in 1996 as a radial medium truck tire designed for stop-and-go inner city metro use.  Because the G159 fit on certain motorhomes, it was subsequently sold for that application.

10.     In the summer 2003, the Haeger family members retained David L. Kurtz, P.C. to represent their interests arising out of the accident.  In the late summer 2003, Goodyear was advised of its responsibility for the tread separation and the accident.  Goodyear refused to acknowledge any responsibility.

11.     In the summer 2005, the Haegers sued Goodyear alleging product liability, design defect, product liability failure to warn, product liability post-sale warning, negligent design, negligent failure to warn and negligent post-sale failure to warn.  The case was removed to the United States District Court and all further proceedings were before the Honorable Roslyn Silver. (*Haeger* I.)

12.     On the first day of trial in April 2010, the case was settled.  It was subsequently discovered that Goodyear, its employees and authorized agents had concealed and misrepresented test evidence regarding the G159.

13.     The Haegers filed their Motion for Discovery Fraud seeking a recovery of fees as a sanction for Goodyear's deceptions.

14.     The sanction proceedings commenced in 2011 and continued through the mid-summer 2012.  In November 2012, Judge Roslyn Silver issued her 66-page Order detailing the various then-known acts of deception by Goodyear, its employees and its agents and awarding approximately $2.7 million in sanctions.

15.     The sanction award was appealed, partially reversed and ultimately remanded to the District Court.  Proceedings relating to the recovery of attorney's fees for Goodyear's acts of deception relating to test data, which were determined to have commenced in October 2006 and continued in the summer 2012, remain ongoing in the Federal Court.  This case excludes any claim for attorney fees or costs during that time period.

1    16.    In May 2013, the Haegers filed a complaint for fraud and abuse of
2  process for the then-known varied acts of deception by Goodyear and its authorized
3  agents and employees, which fraudulently induced the settlement of *Haeger* I.

4    17.    The second Haeger lawsuit was filed in May 2013 in Maricopa County
5  Superior Court (*Haeger* II).  The Complaint sought damages for then known frauds
6  by Goodyear, its employees and agents.

7    18.    Goodyear has been a litigant in the Arizona State Courts on multiple
8  occasions prior to *Haeger* II.  Goodyear's Legal Department was well familiar with its
9  disclosure and discovery obligations before the commencement of *Haeger* II,
10  including in particular the mandates of Rule 26.1 A.R.C.P.

11    19.    Prior to the commencement of *Haeger* II, Goodyear well knew that it
12  had concealed, misrepresented or failed to disclose relevant and material information
13  that was critical to understanding Goodyear's liability for damages caused by its
14  defective G159 tire as well as its exposure for punitive damages and regulatory
15  penalties for its failure to comply with its statutory obligation to recall the G159 as a
16  defective tire which affected motor vehicle safety.

17    20.    Only Goodyear, its employees and agents knew what was being
18  concealed from Plaintiff.

19    21.    Goodyear, its employees and agents knew that they had concealed
20  crucial evidence from Plaintiff since he first commenced discovery in *Haeger* I in
21  September 2006.

22    22.    Only Goodyear, its employees and agents knew the full scope of that
23  deception and the existence of relevant evidence being concealed which Goodyear
24  was required to timely disclose.

25    23.    Goodyear, its employees and agents knew Plaintiff was representing his
26  clients on a contingency fee basis.

27    24.    Goodyear, its employees and agents knew that the continued
28  concealment, misrepresentation and nondisclosure of material relevant evidence

Complaint                                    - 4 -

1    16.    In May 2013, the Haegers filed a complaint for fraud and abuse of
2    process for the then-known varied acts of deception by Goodyear and its authorized
3    agents and employees, which fraudulently induced the settlement of *Haeger* I.

4    17.    The second Haeger lawsuit was filed in May 2013 in Maricopa County
5    Superior Court (*Haeger* II).   The Complaint sought damages for then known frauds
6    by Goodyear, its employees and agents.

7    18.    Goodyear has been a litigant in the Arizona State Courts on multiple
8    occasions prior to *Haeger* II.  Goodyear's Legal Department was well familiar with its
9    disclosure and discovery obligations before the commencement of *Haeger* II,
10   including in particular the mandates of Rule 26.1 A.R.C.P.

11   19.    Prior to the commencement of *Haeger* II, Goodyear well knew that it
12   had concealed, misrepresented or failed to disclose relevant and material information
13   that was critical to understanding Goodyear's liability for damages caused by its
14   defective G159 tire as well as its exposure for punitive damages and regulatory
15   penalties for its failure to comply with its statutory obligation to recall the G159 as a
16   defective tire which affected motor vehicle safety.

17   20.    Only Goodyear, its employees and agents knew what was being
18   concealed from Plaintiff.

19   21.    Goodyear, its employees and agents knew that they had concealed
20   crucial evidence from Plaintiff since he first commenced discovery in *Haeger* I in
21   September 2006.

22   22.    Only Goodyear, its employees and agents knew the full scope of that
23   deception and the existence of relevant evidence being concealed which Goodyear
24   was required to timely disclose.

25   23.    Goodyear, its employees and agents knew Plaintiff was representing his
26   clients on a contingency fee basis.

27   24.    Goodyear, its employees and agents knew that the continued
28   concealment, misrepresentation and nondisclosure of material relevant evidence

1   would cause Plaintiff to incur thousands of hours of unnecessary expense, loss of

2   business opportunities and incur debt associated with maintaining his ongoing

3   business in the years that were to follow.

4        25.    Goodyear knew that the way it was handling *Haeger* I and *Haeger* II

5   would require Plaintiff to devote virtually all of his time acting as an attorney in

6   pursuit of Haeger-related litigation matters and its deceptions were designed to

7   financially exhaust Plaintiff.

8        26.    Goodyear's acts and omissions directly interfered with Plaintiff's

9   capacity to accept additional cases and caused a substantial loss of revenue through

10  its knowing and ongoing deceptions.

11       27.    By 2003, Goodyear had coordinated the defense of G159 cases at a

12  national level by the retention of National Coordinating Counsel and the employment

13  of local counsel in the jurisdictions where each G159 case was filed.   Goodyear's

14  Associate General Counsel operated as the "decision-maker" regarding what would

15  and would not be disclosed in the various G159 cases and worked with Goodyear

16  agents to implement the strategy of knowing deception.

17       28.    Associate General Counsel kept Goodyear General Counsel informed of

18  the developments in the various G159 cases.

19       29.    Goodyear concealed and misrepresented the property damage claim

20  records that contained critical information revealing the defective nature of the G159

21  during *Haeger* I and for years during *Haeger* II.

22       30.    Goodyear concealed and misrepresented its 2006 communications with

23  the National Highway Traffic Safety Administration that contained critical information

24  revealing the defective nature of the G159 during *Haeger* I and for years during

25  *Haeger* II.

26       31.    Goodyear concealed and misrepresented the number of G159 tires sold

27  for use on motorhomes during *Haeger* I and for years during *Haeger* II.

28

32.    Goodyear concealed and misrepresented injuries and death claims and adjustments (warranty returns) regarding the G159 during *Haeger* I and for years during *Haeger* II.

33.    The Complaint in *Haeger* II spanned approximately 80-pages.    Its factual contentions included that Goodyear crafted a national strategy to conceal the truth regarding the G159 before *Haeger* I was filed and continued thereafter; and, that Goodyear had failed to comply with Federal Rules of Procedure and related Court orders.

34.    Goodyear, its employees and agents knew the G159 was defective if it was "subject to a significant number of failures in normal operation," and that the defect determination could be based exclusively on the performance record of the tire.    Goodyear, its employees and agents knew that crucial relevant evidence included the failure rate of the tire, the failure rate of other Goodyear tires and the importance of the tire to the safe operation of the vehicle.

35.    Prior to the commencement of *Haeger* I, Goodyear, its employees and agents knew and concealed the failure data, injury and death claims and denied the G159 was defective.

36.    *Haeger* II began in May 2013.    Goodyear again denied the G159 was defective.

37.    Goodyear, its employees and agents were required to timely disclose relevant evidence pursuant to Rule 26.1, A.R.C.P. in *Haeger* II.    Goodyear, its employees and agents concealed the evidence which they were required to disclose and misrepresented its significance for a period of years.

38.    Goodyear, its employees and agents knew if the relevant information was disclosed, it would reveal the defective nature of the G159, a national fraud in other G159 cases, various fraudulent claims made in other prior Arizona G159 cases, frauds upon the Federal Government and render the case indefensible.

39.   Goodyear filed its first disclosure statement in *Haeger* II on November 23, 2015.   Goodyear knowingly concealed, misrepresented or failed to disclose the lethal and highly relevant information which would reveal the defective nature of the G159 and Goodyear's historical deceptions.

40.   Such relevant information included adjustments and condition codes which would describe the cause of failure, the number of death and injury claims arising from G159 failures, the number of lawsuits filed arising from G159 failures, all property damage claim data which would reveal the date of loss, cause of failure, vehicle type and location of failure (front or rear), and date of manufacture of the failed tire; the number of tires sold as original equipment on motorhomes, internal reports evaluating each failed tire and highly relevant long ago requested communications with the National Highway Traffic Safety Administration (NHTSA) which contained production and failure data disclosure relating to the G159.

41.   In spite of repeated requests in correspondence and in motion practice, Goodyear never disclosed the relevant information until compelled to do so.   It required multiple motions to compel before Goodyear was finally forthcoming with the evidence which was required to be disclosed years prior.   In the interim, *Haeger* II continued at tremendous unnecessary expense.

42.   The various court orders compelled disclosure of such relevant information in *Haeger* II, as all such data was relevant to the punitive damage claims advanced in *Haeger* II.

43.   Goodyear's property damage claims (damage claims other than for the failed tire itself), are contained in various claim forms which Goodyear requires each claimant to complete prior to consideration of the claim.   The claim forms include crucial relevant data, including but not limited to, the date of loss, the date the claim was reported, the date the tire was manufactured, the mileage on the vehicle, the model of vehicle, the make of vehicle and the location of the failure on the vehicle,

1 | whether it be front or rear.  Those same property damage claim forms maintained by
2 | Goodyear include the identification of the cause of failure of each G159 tire.

3 |     44.    Goodyear's practices included the evaluation by Goodyear employees of
4 | each tire which is the subject of a property damage claim.  Goodyear requires the
5 | tires to be returned to Goodyear for analysis.  Goodyear prepares internal documents
6 | which evaluate the cause of the failure for each tire returned to Goodyear in support
7 | of a property damage, injury or death claims.  To this date, Goodyear has continued
8 | to conceal all of its internal records which would further elaborate what Goodyear
9 | knew internally and documented about each property damage claim involving a
10 | G159.

11 |     45.    Goodyear also kept track of all injury and death claims arising out of
12 | G159 failures.  Again, though requested for years, it was not until Goodyear was
13 | compelled by court order in *Haeger* II that Goodyear disclosed the injury and death
14 | claims arising out of G159 failures.

15 |     46.    Goodyear is required by federal regulation to report any defect in the
16 | G159 within five (5) business days of determination that the G159 has a defect
17 | which affects motor vehicle safety.  To this date, Goodyear has never disclosed or
18 | admitted the defective nature of the tire.

19 |     47.    It has always been Goodyear's duty as well as its practice to review
20 | adjustments, property damage, injury and death claims to discern trends in the
21 | claim data indicative of performance problems with the tire.  Goodyear's practice
22 | includes analysis of the number of tires manufactured, the number of tires failing,
23 | and analysis of when and how each tire failed as it relates to Goodyear's statutory
24 | required defect determinations.

25 |     48.    It was not until September 29, 2016, that Goodyear disclosed the
26 | complete truth regarding its adjustment claim data.  Following court order in *Haeger*
27 | II, Goodyear ultimately disclosed the adjustment information which revealed 3,484
28 | adjustments of the G159 tire.  Each adjustment had a "condition code" which is a

1  description of the cause of failure assigned to each tire by Goodyear through its
2  employees.  It revealed the number of G159 tires which were returned as a result of
3  tread separations and multiple other failure conditions, by year of production, long
4  since concealed from Plaintiff and significant evidence of the defective nature of the
5  G159.

6         49.    It was not until September 29, 2016, that Goodyear disclosed the truth
7  about property damage, injury and death claims when it produced a summary list
8  identifying the claim number, the claimant's name, the claimant's city and state of
9  residency, the loss date, the report date, Department of Transportation Code
10 embossed on each tire, the condition codes describing the cause of failure, the
11 vehicle involved, the year the vehicle was manufactured and the make and model of
12 the vehicle.

13        50.    The claim data revealed unprecedented property damage, injury and
14 death claims for this limited production medium truck tire.  The data revealed
15 failures vastly beyond that displayed by any other medium commercial truck tire
16 during the history of manufacture of steel belted radial truck tires by any
17 manufacturer.

18        51.    Goodyear knew that when this data was disclosed, it would highlight
19 Goodyear's deceptions upon the Plaintiff, other G159 litigants, victims and the
20 Federal Government.

21        52.    The summary of property damage claim data described above revealed
22 more than 600 such claims.  It revealed 90% of these claims were occurring on
23 motorhomes traveling at highway speeds.  It revealed that these failures had
24 involved at least 17 different motorhome manufacturers and 39 separate models of
25 motorhomes.

26        53.    The disclosures included for the first time that there had been at least
27 98 injuries and deaths caused by G159 failures.

28

1       54.   The disclosure revealed at least 35 claims for property damage, injury

2  or death involving Arizona residents.

3       55.   The disclosures revealed that Goodyear, its employees and agents had

4  been concealing the same data when requested in other death cases arising from

5  G159 failures filed in the Superior Courts of Pima and Maricopa County in 2005 and

6  2007.

7       56.   After being compelled to do so, in October 2016, Goodyear would

8  disclose a partial production of the actual property damage claim forms (as opposed

9  to the summary Goodyear disclosed in September 2016). Although there had been

10  in excess of 600 property damage, injury or death claims arising from G159 failures,

11  Goodyear produced only 414 of the property damage claim files. They excluded

12  Goodyear's internal report data which would detail its engineering analysis of each

13  failed tire submitted to Goodyear for review.

14       57.   The 414 property damage claims revealed crucial long-concealed

15  liability evidence.

16       58.   Goodyear has historically represented to various courts, including to the

17  Federal Court in *Haeger* I and to Plaintiff that existing failure data regarding the

18  G159 was primarily front end failures caused by a weight imbalance left to right on

19  the front end of Fleetwood and Monaco motorhomes or as a result of customer

20  abuse.

21       59.   Goodyear had misrepresented that the Fleetwood and Monaco failures

22  were "isolated incidents unique to the vehicles involved and did not indicate a

23  universal problem with this tire on all motorhomes." Goodyear, its employees and

24  agents had failed to disclose, concealed and misrepresented the facts by not

25  disclosing its knowledge that the G159 was failing on all motorhomes.

26       60.   The failure data disclosed in October 2016, revealed an almost equal

27  number of front and rear end failures. It also revealed multiple failures occurring

28  within a period of days or miles involving multiple G159 tires on the same vehicle.

1   These claim records also revealed that all accidents were occurring at highway
2   speed.

3       61.    In August 2006, plaintiff had disclosed to Goodyear the theory of
4   liability was that the G159 was prone to heat-induced failures.  Because the G159
5   was designed as a stop-and-go pick-up and delivery tire for city use, that application
6   would expose the tire to low speed utilization with regular opportunities for the tire
7   to cool.  When the G159 was placed on motorhomes, it was exposed to a continuous
8   high speed utilization which generated heat beyond the design limitations of the tire
9   which led to its predictable tread separation.  The long concealed and previously
10  misrepresented property damage claim records disclosed in October 2016 verified
11  the universe of high speed failures of the G159 when used on motorhomes long
12  known to Goodyear and concealed by the acts of its employees and agents.

13      62.    The disclosures in late 2016 revealed the false representations by
14  Goodyear's employees and agents that there was no trend in performance which was
15  indicative of any problem with the G159 when such representations were knowingly
16  false and misleading.

17      63.    In September 2006, plaintiff had asked Goodyear to disclose the
18  number of G159 tires sold as original equipment for motorhome use.  Goodyear,
19  through the representations of its employee, Associate General Counsel and its other
20  agents denied any such data was available.

21      64.    Known only to Goodyear agents and employees, Goodyear had
22  disclosed to the National Highway Traffic Safety Administration (NHTSA), in response
23  to its production demand, the number of G159 tires sold as original equipment on
24  motorhomes in May 2006.

25      65.    On April 26, 2006, NHTSA, as part of its Office of Defect Investigation
26  regarding Country Coach motorhomes made inquiry of Goodyear compelling
27  production of certain specified failure and production information.  NHTSA advised
28  Goodyear that it was attempting to determine approximate failure rates of tires on

Complaint                              - 11 -

the front end involving motorhome applications versus other applications.  NHTSA compelled Goodyear under threat of significant penalty to disclose its production and failure statistics.

66.   On May 30, 2006, Goodyear submitted responsive information supported by affidavits alleging compliance with NHTSA's demands.   The data produced included front end failure rates for the G159 when utilized on motorhomes and other applications (allegedly).  It also revealed the number of G159 tires sold as original equipment on motorhomes.

67.   Goodyear's 2006 disclosure to NHTSA revealed that approximately 34% of G159 tires were being sold for motorhome use, a relevant fact requested as early as 2006 by plaintiffs but never disclosed by Goodyear.

68.   In December 2016, after being compelled by Court order to disclose the NHTSA data, Goodyear finally and for the first time in any G159 case produced the information it provided to NHTSA in response to its production demand of April 2006. The same information had been requested to be disclosed by Goodyear to plaintiff ten (10) years earlier, but was concealed by Goodyear through the acts of its employees and agents and was otherwise misrepresented in various filings and testimony under oath.

69.   In January 2017, plaintiffs verified with NHTSA that the information Goodyear disgorged was a complete response to NHTSA and its production demands of Goodyear.

70.   The Goodyear submittals to NHTSA were riddled with deceptions as Goodyear concealed from the Federal Government the true failure statistics which NHTSA demanded Goodyear to disclose.

71.   When the data was revealed to plaintiff, and added to the newly disclosed property damage claim information, it became immediately apparent that the G159 was the most dangerous steel-belted radial truck tire ever manufactured

1  displaying failures on a parts per million which were unprecedented in American tire
2  manufacturing history.

3      72.    The newly disclosed property damage claim information, the actual
4  property damage claim forms, the NHTSA disclosures and other data finally revealed
5  the historical Goodyear deceptions and fraud upon plaintiff, victims, litigants, the
6  public and the government.

7      73.    When it was finally discovered from Goodyear's disclosure to NHTSA
8  that only 34% of the G159 tires had been sold for motorhome use, it made the
9  failure data skyrocket when motorhome failures were isolated in the light of the
10  limited production statistics.  Instead of approximately 600 property damage claims
11  and 98 deaths and injuries caused out of a population of 160,000 tires, it was
12  discovered 90% of those claims arose from failures on only approximately 50,000
13  tires sold for motorhome use.

14      74.    The new disclosures revealed that Goodyear had required plaintiff to
15  incur more than a decade of time and expense unnecessarily and revealed that
16  Goodyear had knowingly and deceptively caused these unnecessary expenses, loss
17  of business opportunities and willfully inflicted emotional suffering upon plaintiff.

18      75.    Within days of the compelled disclosure of the liability damning data
19  submitted to NHTSA, Goodyear promptly endeavored to settle *Haeger* II and sought
20  to acquire a release for all claims from both the Haegers and plaintiff.    The
21  determination to settle *Haeger* II was a decision solely reserved to the clients and a
22  decision the clients were free to make.  The clients lacked the capacity to settle the
23  plaintiff's claims for the thousands of hours of unnecessary time incurred, loss of
24  business opportunities, unnecessary debt incurred and emotional suffering knowingly
25  caused by Goodyear.

26      76.    Plaintiff claims arising from Goodyear deceptions were thus completely
27  excluded from the settlement agreement between Goodyear and the Haegers.

28

77. Pursuant to Court Order, on July 10, 2017, plaintiff disclosed the long-concealed information to NHTSA. On December 28, 2017, NHTSA opened its defect investigation as the result of these disclosures specifying that the number of claims suggest that the failures may stem from a safety –related defect.

78. NHTSA's defect investigation public notice observed that it had not previously had access to the failure data, injury and death claims as a result of Goodyear's utilization of protective orders which prohibited disclosure by plaintiff to the Government. In April 2018, NHTSA's Office of Defect Investigation sent 35 separate Information Requests to Goodyear, advising Goodyear that the failure to fully respond could subject Goodyear to a maximum penalty of $105 million. The information sought included copies of all Goodyear internal reports evaluating each tire which was the subject of a property damage, injury claim or lawsuit and demanded Goodyear disclose its assessment of alleged defects, including comparison of the property damage claim rates of the G159 with other tires.

79. Both Goodyear and NHTSA knew that Goodyear evaluated trends of failure data on a parts per million basis.

80. Both Goodyear and NHTSA knew that Goodyear's parts per million failure data had been previously studied by NHTSA in conjunction with its evaluation of recalled Firestone tires. NHTSA had performed a similar peer comparison of the failure rates of Firestone tires with those of Goodyear. The Firestone tires had disclosed an average failure claim rate of approximately 229 parts per million. The Goodyear peer tire had displayed a claim failure rate of 0 to 10 parts per million. The data plaintiff disclosed to NHTSA revealed a parts per million claim rate for the G159 that was in excess of 10,000 ppm.

81. NHTSA and Goodyear were also familiar with Goodyear's prior disclosure of injury and death claims arising out of Goodyear's tires (The Goodyear Wrangler RTS used on Ford Explorers), which were contrasted with the Firestone recalled tires at issue. The Goodyear Wrangler RTS tire had zero death or injury claims arising out

1  of the 2,872,808 tires sold.  The G159 displayed 98 death and injury claims out of
2  160,683 tires.

3      82.    As was observed by Judge Hannah during *Haeger* II, failure data
4  considered collectively affords key insight into design issues regarding the G159
5  because it allows the manufacturer to correlate tire failures with particular
6  applications such as the use of the G159 on motorhomes.  Judge Hannah also found
7  that Goodyear arguably used protective orders dishonestly to gain an unwarranted
8  advantage in litigation and to avoid tort liability.

9      83.    Judge Hannah observed that the G159 personal injury and property
10  damage claims can be interpreted to suggest a product is dangerous and that
11  Goodyear's nondisclosure was merely damage control and the interest it was
12  protecting was not competitive advantage but rather avoiding bad publicity and
13  potential liability.

14      84.    In *Haeger* I, Goodyear had an ongoing duty to supplement discovery
15  responses and disclosures pursuant to Court order or when they were materially
16  incomplete or incorrect and to otherwise correct false statements of fact.  That duty
17  has been continuous since 2006 and continues until the conclusion of the
18  proceedings in *Haeger* I which remain ongoing.

19      85.    If Goodyear had complied with these obligations, all of the information
20  which Goodyear was compelled to disclose would have been disclosed years ago and
21  rendered *Haeger* II wholly unnecessary.  Upon such complete disclosure, Goodyear
22  would have opted to resolve the Haegers' claims and all the expenses, losses and
23  emotional suffering by plaintiff would not have occurred.

24      86.    Those disclosures would have changed the entire legal landscape and
25  the appellate proceedings would have been unnecessary or otherwise based upon an
26  honest and complete record.

27      87.    Because Goodyear failed to comply with these obligations, plaintiff was
28  forced to incur all the unnecessary expenses associated with the appeals which were

1 based upon a false and incomplete record, entitling plaintiff to recover his damages
2 from the end of the sanction briefing in *Haeger* I to date, which arose from those
3 deceptions and Goodyear's failure to comply with its supplementation obligation.

4     88.     Plaintiff specifically reserves the right to supplement this Complaint with
5 new or soon to be disclosed additional information which bears upon Goodyear's
6 ongoing fraud upon the plaintiff including the long-concealed complete property
7 damage claim forms, its internal assessments of failure data and internal
8 communications which remain concealed regarding the honest assessment of the
9 defective nature of the G159 and why it had not been recalled 18 years ago.

10              **COUNT ONE – Fraudulent Misrepresentation**

11     89.     Plaintiff incorporates the preceding allegations in ¶¶ 1-88.

12     90.     Goodyear, its employees and agents made misrepresentations for the
13 purpose of inducing the plaintiff to act or refrain from action in reliance upon these
14 representations.  Each of the representations was false and material.  Goodyear, its
15 employees and agents knew the falsity of such representations or were otherwise
16 ignorant of their truth.   Goodyear its employees and agents intended the
17 misrepresentations to be acted upon by the plaintiff.  The plaintiff was ignorant of
18 the falsity of the representations and relied upon the truth of such representations.
19 Plaintiff had the right to rely upon the truth of such representations.

20     91.     As a result of plaintiff's reliance, plaintiff has been proximately injured.

21     92.     As the result of these material misrepresentations plaintiff was forced to
22 incur thousands of hours of unnecessary time and related expenses to his damage.

23     93.     Plaintiff is entitled to damages reflecting recovery of the value of the
24 thousands of hours of lost time incurred unnecessarily as the result of the fraud of
25 Goodyear, its employees and agents, lost business revenue, cost expenditures and
26 for his emotional suffering.

27     94.     Plaintiff is entitled to an award of punitive damages.

28

## COUNT TWO – Fraudulent Non-Disclosure

95.    Plaintiffs incorporate the preceding allegations in ¶¶ 1-94.

96.    Goodyear, its employees and agents failed to disclose to plaintiff the facts which they knew would justifiably induce the plaintiff to act or refrain from acting in conjunction with the *Haeger* II litigation and in his appellate efforts.

97.    Goodyear, its employees and agents had a duty to plaintiff to exercise reasonable care to disclose matters concealed from the plaintiff years prior to when the information was ultimately compelled to be disclosed in accord with applicable Rules of Civil Procedure, pursuant to court orders and as a party to the litigation.

98.    Goodyear, its employees and agents knew that the failure to disclose matters previously concealed and misrepresented was necessary to prevent statements provided to the plaintiff from being misleading.

99.    Goodyear, its employees and agents knew that absent further timely and complete disclosure, the plaintiff would continuously incur thousands of unnecessary hours of work, lost opportunities and associated expenses, including emotional suffering, all of which would have been unnecessary had Goodyear been forthcoming and complied with its obligations.

100.   Goodyear's non-disclosures, through its employees and agents were either false or created a false impression, were material and Goodyear, its employees and agents knew of the falsity of such representations or the materially misleading nature of their omissions.

101.   Goodyear, its employees and agents intended that the misrepresentations and/or omissions should be acted upon by the plaintiff.  The plaintiff was ignorant of the falsity of the representations and unaware of the nature of the material omissions and relied upon the truth of Goodyear's prior representations and its obligation to be forthcoming with its disclosure obligations. Plaintiff had the right to rely upon the truth of such representations.

102.  As a result of plaintiff's reliance, plaintiff has been proximately injured in a manner previously described.

103.  Plaintiff is entitled to an award of punitive damages.

### COUNT THREE – Fraudulent Concealment

104.  The plaintiff incorporates the preceding allegations in ¶¶ 1-103.

105.  Goodyear through its employees and agents, by concealment, intentionally prevented plaintiff from timely acquiring material information.

106.  The concealment of material information caused a pecuniary loss to the plaintiff.

107.  Goodyear through its employees and agents intentionally prevented the plaintiff from learning of the material facts that were significant in a timely fashion to his damage.

108.  Goodyear's deceptive acts were intended to hide information, mislead, avoid suspicion and prevent further inquiry into material matters described within the body of the Complaint.

109.  Goodyear through its employees and agents actively concealed material facts by words or acts which created a false impression, covering up the truth, including false denials of knowledge by Goodyear, its employees and agents, who were in possession of the facts.

110.  As a result of Goodyear's acts through its employees and agents, plaintiff has been proximately injured in an amount to be proven at trial.

111.  As a result of these material misrepresentations, plaintiff was deceived into incurring thousands of hours of unnecessary expense, lost opportunities, emotional damage and debt.

112.  Plaintiff is entitled to an award of punitive damages.

### COUNT FOUR –Abuse of Process

113.  Plaintiff incorporates the preceding allegations in ¶¶ 1-112.

1   114.   Goodyear, its employees and agents willfully utilized judicial process for
2   purposes not proper in the regular conduct of the proceedings in *Haeger* II.

3   115.   Goodyear, its employees and agents utilized a process in *Haeger* II for
4   illegitimate purposes, including misleading filings, purposely deceptive pleadings,
5   obstructing access to evidence which required disclosure pursuant to applicable rules
6   of procedure, testifying falsely, knowingly making false statements of facts to the
7   Court, failing to correct false statements of facts previously made to the Court,
8   knowingly offering evidence which Goodyear knew to be false, knowingly engaging in
9   fraudulent conduct relating to the judicial process and failing to timely take remedial
10  measures, including disclosure to the court and plaintiff, all of which was prohibited
11  and prejudicial to the administration of justice.

12  116.   Goodyear's acts through its employees and agents were undertaken for
13  improper purposes and utilized the process for purposes for which it was never
14  intended.

15  117.   Goodyear, its employees and agents caused the plaintiff to suffer
16  emotional distress, inconvenience, anxiety and frustration to his damage.

17  118.   Plaintiff is entitled to an award of punitive damage.

18  **COUNT FIVE – Aiding and Abetting**

19  119.   Plaintiff incorporates the preceding allegations in ¶¶ 1-118.

20  120.   Goodyear and its employees substantially aided Goodyear's outside
21  counsel which appeared on its behalf in *Haeger* I and *Haeger* II to commit wrongful
22  and prohibited conduct which damaged the plaintiff, including fraudulent
23  misrepresentations, fraudulent non-disclosure, fraudulent concealment and abuse of
24  process.

25  121.   Plaintiff is entitled to an award of punitive damages.

26  WHEREFORE, Plaintiff requests that the Court enter its Order:

27  A.   Awarding Plaintiff his damages incurred as a result of the wrongful acts
28  and omissions of Goodyear through its employees and agents;

1    **B.**     Awarding punitive damages in an amount sufficient to punish and deter

2  Goodyear for its willful, outrageous and evil misconduct.

3        DATED this 1st day of October, 2018.

4                                    THE KURTZ LAW FIRM

5

6                         By:_____
                                   David L. Kurtz
7                                   7420 East Pinnacle Peak Road, Suite 128
                                   Scottsdale, AZ    85255
8                                   *Attorney for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1(C)

CHRIS DEROSE, CLERK
DEP
L. COOPER, FILED
18 OCT -1 PM 4: 2:

1 | David L. Kurtz - 007433
dkurtz@kurtzlaw.com
2 | **THE KURTZ LAW FIRM**
7420 East Pinnacle Peak Road, Suite 128
3 | Scottsdale, Arizona  85255
Telephone: (480) 585-1900
4 |
5 | Attorneys for Plaintiff
6 |
7 |        **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
8 |        **IN AND FOR THE COUNTY OF MARICOPA**
9 | DAVID L. KURTZ, individual and as    No. CV2018-053331
President of DAVID L. KURTZ, P.C. doing
10 | business as THE KURTZ LAW FIRM,
11 |                Plaintiff,          **CERTIFICATE OF COMPULSORY**
                                       **ARBITRATION**
12 | vs.
13 | THE  GOODYEAR  TIRE  &  RUBBER
COMPANY, an Ohio corporation,
14 |
                Defendant.
15 |
16 |        The undersigned certifies that the largest award sought by the complainant,
17 | including punitive damages, but excluding interest, attorneys' fees, and costs **does**
18 | exceed limits set by Local Rule for compulsory arbitration.  This case **is not** subject
19 | to compulsory arbitration as provided in Rules 72 through 77 of the Rules of Civil
20 | Procedure.
21 |        DATED this 1st day of October, 2018.
22 |                                THE KURTZ LAW FIRM
23 |
24 |                                By: _____
                                    David L. Kurtz
25 |                                7420 East Pinnacle Peak Road, Suite 128
                                    Scottsdale, AZ   85255
26 |                                *Attorney for Plaintiff*
27 |
28 |
Cert Re Arbitration

# EXHIBIT 1(D)

CHRIS DEROSE, CLERK
BY
L. COOPER, FILED
18 OCT -1 PM 4:2[?]

1  David L. Kurtz - 007433
   dkurtz@kurtzlaw.com
2  **THE KURTZ LAW FIRM**
   7420 East Pinnacle Peak Road, Suite 128
3  Scottsdale, Arizona  85255
   Telephone: (480) 585-1900
4

5  Attorneys for Plaintiff

6

7            **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

8            **IN AND FOR THE COUNTY OF MARICOPA**

9  DAVID L. KURTZ, individually and as          No. CV2018-053331
   President of DAVID L. KURTZ, P.C. doing
10 business as THE KURTZ LAW FIRM,

11                     Plaintiff,          **PLAINTIFFS' DEMAND FOR JURY
                                           TRIAL**
12 vs.

13 THE   GOODYEAR   TIRE   &   RUBBER
   COMPANY, an Ohio corporation,
14
                     Defendant.
15

16         Plaintiff, DAVID L. KURTZ, individually and as President of DAVID L. KURTZ,

17 P.C. doing business as THE KURTZ LAW FIRM, by and through their counsel

18 undersigned, requests that the above-referenced case be tried to a jury.

19         DATED this 1st day of October, 2018.

20                                         THE KURTZ LAW FIRM

21

22                                         By: _____
                                               David L. Kurtz
23                                             7420 East Pinnacle Peak Road, Suite 128
                                               Scottsdale, AZ   85255
24                                             *Attorney for Plaintiff*

25

26

27

28

Jury Trial Demand

# EXHIBIT 1(E)


Office Distribution

# SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

**FILED**
12/05/2018
by Superior Court Admin
on behalf of Clerk of the
Superior Court

Ct. Admin
Deputy

12/01/2018

COURT ADMINISTRATION

**Case Number:** CV2018-053331

**David L Kurtz**

**V.**

**Goodyear Tire & Rubber Company, The**

---

The Judge assigned to this action is the Honorable Bruce R Cohen

### NOTICE OF INTENT TO DISMISS FOR LACK OF SERVICE

You are hereby notified that the complaint filed on 10/01/2018 is subject to dismissal pursuant to Rule 4 (i) of the Arizona Rules of Civil Procedure. The deadline for completing service is 12/31/2018. If the time for completing service has not been extended by the court and no defendants have been served by this date, the case will be dismissed without prejudice.

All documents required to be filed with the court should be electronically filed through Arizona Turbo Court at www.azturbocourt.gov.

Superior Court of Maricopa County - Integrated Court Information System
**Endorsee Party Listing**
Case Number: CV2018-053331

| Party Name | Attorney Name | |
|---|---|---|
| David L Kurtz | David L Kurtz | Bar ID: 007433 |

# EXHIBIT 1(F)

Chris DeRose, Clerk of Court
*** Electronically Filed ***
K. Vega, Deputy
12/31/2018 10:39:00 AM
Filing ID 10016803

1  David L. Kurtz - 007433
   dkurtz@kurtzlaw.com
2  **THE KURTZ LAW FIRM**
   7420 East Pinnacle Peak Road, Suite 128
3  Scottsdale, Arizona  85255
   Telephone: (480) 585-1900
4
   Attorney for Plaintiffs
5

6              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

7                **IN AND FOR THE COUNTY OF MARICOPA**

8  | DAVID L. KURTZ, individually and as | No. CV2018-053331 |
   President of DAVID L. KURTZ, P.C. doing
9  business as THE KURTZ LAW FIRM;
   DAVID L. KURTZ, P.C., an Arizona
10 Professional Corporation,

11              Plaintiffs,

12 vs.

13 THE GOODYEAR TIRE & RUBBER
   COMPANY, an Ohio corporation,
14
                Defendant.
15

**AMENDED COMPLAINT**
(RICO Claim: 18 U.S.C. §§ 1964(c) and
1962 (c)(d), Fraudulent
Misrepresentation, Fraudulent Non-
Disclosure, Fraudulent Concealment,
Abuse of Process, Aiding and Abetting,
Intentional Interference with Business
Expectancy)

16      Plaintiffs, through counsel undersigned, alleges as follows:

17 **I.    INTRODUCTION:**

18      The following claims arise from years of orchestrated deceptions by The

19 Goodyear Tire & Rubber Company ("Goodyear") and its scheme to conceal evidence

20 regarding the defective nature of the G159 275/70R 22.5 radial medium truck tire

21 (hereafter "the G159") from victims, the National Highway Traffic Safety

22 Administration ("NHTSA"), the courts, the public and attorneys involved in various

23 federal and state court proceedings involving G159 failures from 2003 through 2018.

24      Goodyear and its agents collaborated and conspired to misuse and exploit the

25 judicial system as part of a continuous scheme and method of doing business in the

26 G159 cases by misrepresenting facts in discovery, ignoring disclosure directives,

27 evading discovery obligations, filing false declarations, advancing frivolous

28 arguments, presenting witnesses willing to lie under oath, making false evidentiary

Amended Complaint

1   presentations to the courts, knowingly creating false records for appellate
2   proceedings, obstructing justice, and failing to comply with ethical and procedural
3   rules and requirements, including obligations to supplement and correct its
4   deceptions of record.

5       Goodyear and its cabal of lawyers and witnesses devoted to acts of deception
6   intentionally defeated the well-designed litigation process and crippled any
7   meaningful search for truth in the G159 cases.  Though repeatedly sanctioned for
8   litigation misconduct between 2006 and 2018, the penalties have served as little
9   more than an irritant cost of doing business.  For Goodyear, the prize has always
10  been evading the hundreds of millions of dollars of liability verdicts, punitive
11  damages, regulatory penalties and brand damage which would have followed if
12  Goodyear complied with its statutory obligations, including recalling the G159 in or
13  about 2000 when the evidence was overwhelming that the tire was defective,
14  unreasonably dangerous, and posed a significant risk to the consuming public.
15  Irreverent and unbridled by ethics or morality, Goodyear officers and agents made
16  millions of dollars in compensation while concealing the truthful cause of the human
17  carnage that followed.  The thousands of hours of misguided endeavors by the courts
18  and plaintiffs' attorneys in the G159 cases are considered by Goodyear as simple
19  collateral damage, well worth the risk.

20      The claims asserted herein document how a deviant corporation defeats the
21  due administration of justice by exploiting the courts' rule-based expectations of the
22  officers who practice before them and the financial damage which follows.  For a
23  corporation with corrupt and criminal intent, this case sets forth the appropriate
24  consequence and the only path of recovery for officers of the court damaged by such
25  continuous deceptions.

26      It has been no small matter.  It took plaintiffs 11-years of litigation, for
27  Goodyear to finally disclose that there have been more than 100 deaths and injuries
28  arising out of G159 failures and that the G159 generated more claims for property

1  damage, injury and death than any other steel belted radial tire in American history,
2  as measured on an equal production basis.  For more than a decade, Goodyear and
3  its agents effectively concealed these horrific facts in every G159 case in the country
4  and defeated plaintiffs' capacity to even understand how they were being damaged.
5  Nonetheless, the G159 remains on American highways and Goodyear's criminal,
6  fraudulent and conspiratorial actions continue unabated.

7      This Amended Complaint sets forth the facts which reveal the enterprise
8  created by Goodyear -- through which it has engaged in a pattern of racketeering
9  activity for more than a decade -- which has caused expected injury to Plaintiffs'
10 business and property.  It sets forth additional facts which support related state law
11 claims.

12 **II.   PARTIES AND VENUE**

13     1.    David L. Kurtz is and has been a resident at all material times in
14 Maricopa County, Arizona.  David L. Kurtz has been employed by David L. Kurtz, P.C.
15 since 1999, as an attorney duly-licensed in Arizona and also serves as the President
16 of David L. Kurtz, P.C.

17     2.    David L. Kurtz, P.C. was formed in Arizona in 1999 pursuant to Title 10,
18 Chapter 20 of the Arizona Revised Statutes to engage in the practice of law, as
19 governed by the various rules of the Arizona Supreme Court, particularly Rules 33-37
20 and Rule 42 (Rules of Professional Responsibility), and at all material times has done
21 business in Maricopa County, Arizona.  David L. Kurtz, P.C. does business as The
22 Kurtz Law Firm.  The Professional Corporation has always been solely owned by
23 David L. Kurtz and since 2006, David L. Kurtz has been the sole attorney employee
24 of David L. Kurtz, P.C. as a "qualified person" eligible under Title 10, Chapter 20 to
25 be issued shares by the professional corporation.  The professional corporation is and
26 has been a corporation for profit that is not a foreign professional corporation and is
27 incorporated under or subject to Title 10, Chapter 20 of the Arizona Revised
28 Statutes, and provided professional services that may be lawfully rendered only by a

1 | person licensed or otherwise authorized by a licensing authority in Arizona to render
2 | such services.

3 |     3.     Defendant Goodyear Tire & Rubber Company ("Goodyear") is an Ohio
4 | corporation which does business throughout the United States, including Maricopa
5 | County, Arizona.  Defendant Goodyear's acts and omissions caused events to occur
6 | in Maricopa County which are the subject of this Complaint and its criminal conduct
7 | vests this court with appropriate personal jurisdiction as such conduct has occurred
8 | continuously in the State of Arizona.

9 |     4.     The acts described hereafter were undertaken by Goodyear through its
10 | authorized agents, employees, officers and board of directors in the scope of and in
11 | furtherance of their employment with Goodyear and its business interests.

12 |     5.     Goodyear's agents include its outside counsel involved in relevant G159
13 | tire litigation cases and involved in evaluating, advising and implementing Goodyear
14 | decisions relating to defect determinations, reporting, concealing and implementing
15 | Goodyear deceptions relating to the G159 tire.

16 |     6.     Goodyear authorized each of the acts and omissions of its authorized
17 | agents and employees which are the subject of this amended complaint.

18 |     7.     Goodyear ratified each of the acts and omissions of its authorized
19 | agents and employees which are the subject of this amended complaint.

20 |     8.     Goodyear's Board of Directors has either authorized or ratified the acts
21 | and omissions of Goodyear employees and its agents which are the subject of this
22 | amended complaint.

23 |     9.     Due to the amount at issue, this case should be classified as a Tier 3
24 | case.

25 | **III.   THE CREATION OF AN ENTERPRISE AND ITS PURPOSE**

26 |     10.     The G159 was first manufactured in 1996.  By the end of 1999, there
27 | had been hundreds of failed G159 tires returned to Goodyear, dozens of G159
28 | failures which had caused property damage claims and at least eight death or injury

1  claims. The death and injury claims all occurred at highways speeds when the tire
2  was used on motorhomes. Only Goodyear knew of these failures and none was
3  disclosed to the public.

4      11.   By no later than December 31, 2000, the ever-escalating injury, death
5  and property damage claims arising from G159 failures required Goodyear by statute
6  to publicly declare that the G159 was defective and recall the tire, as it displayed an
7  unprecedented number of failures in normal operation.

8      12.   Rather than publicly recall the G159 as a defective tire, Goodyear
9  secretly endeavored to revise the design of the tire in a failed endeavor to make the
10  tire more heat resistant.

11      13.   As the death and injury claims mounted, Goodyear actively deceived
12  motorhome manufacturers by concealing its test and failure data which revealed that
13  the G159 was generating temperatures beyond its design capacity and predictive of
14  failures.

15      14.   In 2003, Goodyear decided to cease production of the G159. It
16  determined that its financial interests were better served by attempting to defend
17  the ever-escalating lawsuits and corruptly concealing all of the testing and failure
18  data from the government, victims, the courts and the public which would reveal the
19  defective nature of the tire. As of January 1, 2003, there had been at least 38 death
20  or injury claims and more than 433 property damage claims arising from G159
21  failures.

22      15.   This corrupt decision was wrought with peril. The tire's tread life would
23  last up to 100,000 miles. By 2003, Goodyear knew the tire was subject to
24  catastrophic failures when exposed to continuous high-speed use.

25      16.   Though designed as a city stop-and-go delivery tire and primarily sold
26  for that application, it was also marketed and sold for motorhome use. By 2003,
27  Goodyear knew that the failures causing death, injury or property damage were
28  primarily occurring on motorhomes at highway speeds (90% of all claims involved

1   motorhomes).  Goodyear also knew that motorhomes were seldom driven more than
2   a few thousand miles per year and that Goodyear had never warned its customers
3   that the tire had any form of limited life.  Goodyear knew that the tire would remain
4   on the American highways for years to come as a result of its decision to not recall
5   the defective G159 tire.  There have been at least 59 additional injuries and deaths
6   arising out of G159 failures since 2003, hundreds of new property damage claims
7   which occurred at highway speeds when the G159 was used on motorhomes and the
8   tire remains on American highways.

9       17.    Rather than recall the tire, in a corrupt endeavor to advance Goodyear's
10  "best interests," Goodyear's Legal Department determined in 2003 that it would
11  orchestrate and corruptly control the flow of information in all G159 cases in federal
12  and state courts through the retention of National Coordinating Counsel, a single law
13  firm which would knowingly deploy Goodyear's scheme in all G159 cases across the
14  country.   Goodyear's Legal Department would also select local counsel in each
15  federal or state case which involved a G159 claim, who would willingly assist in
16  executing the scheme.   Local counsel generally reported to National Coordinating
17  Counsel but also regularly communicated with Goodyear's Legal Department.

18      18.    Goodyear's Legal Department managed this enterprise.

19      19.    The Goodyear Product Analysis Group ("PAG") worked with Goodyear's
20  Legal Department and the outside law firms.   It acted as a part of this corrupt
21  enterprise.  Goodyear and its PAG would decide what, if any, documents would be
22  disclosed in the G159 cases.  Members of the PAG would appear in each G159 case
23  as Goodyear's 30(b)(6) witnesses, serving as Goodyear's corporate spokesperson.
24  PAG members also served as Goodyear expert witnesses.

25      20.    With the assistance of enterprise members, the PAG witnesses regularly
26  lied about test and failure data when deposed as 30(b)(6) witnesses or expert
27  witnesses in a concerted effort to conceal failure and claim data and deceive courts
28  and litigants about temperature limitations of the G159.  PAG witnesses regularly

1  crafted deceptive expert opinions for disclosure which intentionally omitted critical

2  data that concealed the defective nature of the G159.

3       21.    Goodyear's Legal Department universally failed to disclose all relevant

4  test and failure data in every G159 case in the federal and state courts.  When such

5  data was requested, outside counsel would submit evasive and/or deceptive

6  discovery responses approved by Goodyear's Legal Department.   PAG witnesses

7  would craft their deceptive testimony to be consistent with the limited and untrue

8  discovery responses.

9       22.    Goodyear's Associate General Counsel would serve as the final decision-

10  maker for all disclosures of information in response to requests for production or

11  interrogatories and in Goodyear's disclosure statements which were regularly filed in

12  the G159 cases.  Associate General Counsel would keep Goodyear's General Counsel

13  apprised of all significant developments in the G159 cases.   Goodyear's Legal

14  Department provided false verifications, when verification was required.

15       23.    After May 2006, Goodyear's Legal Department, National Coordinating

16  Counsel, local counsel and PAG members collectively met and participated in

17  concealing or conspiring to conceal Goodyear communications with NHTSA regarding

18  the G159 which contained the OEM sales of the G159 for motorhome use and G159

19  failure data for the tire when used on motorhomes.

20       24.    Goodyear, its National Coordinating Counsel and local counsel would

21  craft disclosure statements so that they contained no meaningful information.

22  Crucial NHTSA communications, failure data and test data were never revealed in

23  disclosure statements.  Goodyear's internal policies and practices relating to analysis

24  of test and failure data were never revealed in disclosures.   Goodyear witnesses

25  which required disclosure were never disclosed.

26       25.    The scheme assured that Goodyear's Legal Department would be in

27  control of who would serve as Goodyear's corporate spokesman in each G159 case

28  and which expert witnesses would be utilized to advance Goodyear's deceptions.

Amended Complaint                              - 7 -

26.     Goodyear required its National Coordinating Counsel and local attorneys to acquire secrecy protective orders in each case where any type of disclosure was to occur.  The protective orders were designed to provide Goodyear with the ability to proclaim any document or testimony to be confidential such that it could not be disclosed in other G159 cases.

27.     In each case Goodyear's enterprise would corruptly persuade the parties and/or the court that secrecy protective orders were necessary to protect trade secrets and were not designed to preclude disclosures of relevant data in other G159 cases.

28.     Goodyear would then corruptly use these secrecy orders and claims of confidentiality to conceal all damning testimony and documents which were disclosed in any case from other federal and state courts handling G159 cases and facilitate Goodyear's practice of selecting witnesses who would testify falsely on Goodyear's behalf as part of its corrupt scheme.

29.     When responding to discovery, Goodyear, National Coordinating Counsel and local counsel would regularly allege that plaintiffs had failed to specify a defect theory, to avoid providing any meaningful response to discovery.  This same strategy was utilized in all G159 cases and is a practice which has been sanctioned.

30.     The "best interest" of Goodyear was the common theme adopted by Goodyear, National Coordinating Counsel and local counsel and was relied upon to limit disclosures, discovery responses and supplementation decisions so as to evade revealing damaging information regarding the G159 in all G159 cases.

31.     Goodyear's Legal Department, outside counsel and Goodyear witnesses were each aware of the common purpose of the enterprise and intended to participate in it.

32.     National Coordinating Counsel and local counsel deferred to Goodyear's determinations as to what would remain concealed over the years, consistent with the common and shared purpose of the enterprise, in exchange for fees.

1    33.    The entire scheme assured that no matter which case was developing
2  Goodyear's Legal Department would exercise a managerial role in the affairs of the
3  enterprise.  Through these deceptive endeavors, the members of Goodyear's Legal
4  Department and in particular its General Counsel and Associate General Counsel
5  were paid tens of millions of dollars over the years.

6    34.    Goodyear, its outside counsel and employee witnesses' approach to
7  G159 litigation became a regular way of doing business and a pattern of practice.

8    35.    The enterprise continues to date, as Goodyear and its attorneys
9  continue to corruptly endeavor to influence, obstruct and impede the due
10  administration of justice in the federal court in Haeger v. Goodyear, which has been
11  a continuous federal court proceeding in Arizona involving the G159 from 2005 to
12  date. (*Haeger* I.)

13    36.    The racketeering activities of this enterprise over the years included a
14  conspiracy to commit and commission of various federal crimes including mail fraud
15  (18 U.S.C. §1241), wire fraud (18 U.S.C. §1343), corrupt endeavors to influence
16  judicial officers/corrupt endeavors to influence, obstruct and impede the due
17  administration of justice (18 U.S.C. § 1503), and corrupt persuasion and misleading
18  conduct with the intent to influence testimony and withhold records from official
19  proceedings and concealment with intent to impair document and testimony
20  availability for use in official proceedings (18 U.S.C. §1512).   The following
21  paragraphs more fully set forth these activities which serve as the prohibited
22  predicate acts and reflect a continuous pattern of racketeering activity which affected
23  interstate commerce and support Plaintiffs' claims and remedies pursuant to
24  18 U.S.C. § 1964 (arising from Goodyear's conduct and violation of 18 U.S.C. §1961
25  and 18 U.S.C. § 1962(c) and § 1962(d)) and related state claims.

26    37.    Goodyear's racketeering activities have corruptly influenced, obstructed
27  and impeded the due administration of justice in the Arizona Federal Court from
28  2005 through 2018.  They have also corruptly influenced, obstructed and impeded

1   the due administration of justice in appellate proceedings before the Ninth Circuit
2   Court of Appeals and the Supreme Court of the United States related to the Arizona
3   District Court's 2012 Sanction Order, which has been the subject of both appeals.

4          38.    With Goodyear's corrupt scheme in place, Goodyear and its enterprise
5   members conspired to and/or continued to act corruptly, endeavored to influence,
6   obstruct or impede the due administration of justice in *Haeger* II, which was filed in
7   May 2013 in the Maricopa County Superior Court in order to avoid disclosures which
8   were directly relevant to ongoing proceedings in *Haeger* I and of specific concern to
9   the National Highway Traffic Safety Administration (NHTSA).

10         39.    While Goodyear expected its scheme to evade hundreds of millions of
11  dollars of liabilities while it sacrificed consumers, Goodyear knew and intended that
12  its conduct would damage Plaintiffs' business and property interests and improperly
13  interfere with plaintiffs' business expectancies.  The scheme was so effective that it
14  was not until late 2016 that plaintiffs were able to discover the vast deceptions, in
15  spite of their diligent efforts to discover the truth.

16         40.    The activities of this enterprise and Goodyear's acts in particular have
17  affected and continue to affect interstate commerce.

18  **IV.   STATEMENT OF FACTS IN SUPPORT OF RACKETEERING AND STATE**
        **LAW CLAIMS.**
19

20         41.    In the summer 2003, the Haeger family members retained David L.
21  Kurtz, P.C. to represent their interests arising out of a G159 tread separation and
22  motorhome rollover accident which caused serious and permanent injuries to the
23  Haeger family.

24         42.    In the summer 2005, the Haegers sued Goodyear alleging product
25  liability, design defect, product liability failure to warn, product liability post-sale
26  warning, negligent design, negligent failure to warn and negligent post-sale failure to
27  warn.   The case was removed to the United States District Court and all further
28  proceedings were before the Honorable Roslyn Silver.  (*Haeger* I.)

43.   On the first day of trial in April 2010, the case was settled.   It was subsequently discovered that Goodyear, its employees and authorized agents had concealed and continuously misrepresented test evidence regarding the G159, which was requested to be disclosed in 2006.

44.   The Haegers filed their Motion for Discovery Fraud seeking a recovery of fees as a sanction for Goodyear's deceptions.

45.   The sanction proceedings commenced in 2011 and continued through the mid-summer 2012.  In November 2012, Judge Roslyn Silver issued her 66-page Order detailing the various then-known acts of deception by Goodyear, its employees and its agents and awarding approximately $2.7 million in sanctions.   Each of the factual findings were based upon clear and convincing evidence.  The District Court found:

a.   Goodyear made repeated and deliberate decisions to delay production of relevant information, made misleading and false in-court statements that concealed relevant documents.  In spite of Goodyear's disclosure obligations, its initial disclosure statement contained no meaningful information and was never supplemented in any relevant way during the years of litigation which preceded the Court's sanction order.

b.   The repeated written representations by Goodyear that plaintiffs did not state the legal theory of their case until January 2007, was incorrect, contradicted by Goodyear's own statements and was part of a general strategy to obstruct and delay discovery.

c.   Goodyear's local counsel made false representations to the District Court throughout the proceedings.

d.   Goodyear misrepresented to the Court that it had responded to all outstanding discovery.

1       e.    Goodyear's counsel lied about when test data had been requested

2             for production.

3       f.    Goodyear misled the Court when it represented that it had

4             produced all testing on any tire that was the same as any of the

5             tires for sale.

6       g.    Goodyear repeatedly represented to the District Court that there

7             were no other documents beyond those already produced, while

8             Goodyear was concealing a wide variety of other test data.

9       h.    Goodyear concealed the same tests in other related G159 Arizona

10            State Court cases.

11      i.    Goodyear had no interest in complying with its discovery

12            obligations unless it was in the "best interest" of Goodyear.

13      j.    Goodyear knowingly concealed crucial documents during the

14            Federal Court case.

15      k.    Goodyear's Associate General Counsel filed a misleading and false

16            declaration in conjunction with the Federal Court sanction

17            proceedings.

18      l.    Goodyear submitted a false declaration from its 30(b)(6) witness.

19      m.   Goodyear's corporate spokesman made false representations

20            during the course of his deposition.

21      n.    The false testimony by Goodyear's witness only emerged as a

22            result of Goodyear's inability to keep its falsehoods straight.

23      o.    Goodyear's court filings regarding whether various tests should

24            have been produced during the course of the *Haeger* litigation

25            represented a dizzying array of misstatements and simple

26            falsehoods.

27      p.    Goodyear falsely misled the District Court during 2007 when it

28            represented that Goodyear had responded to all discovery.

q.   Goodyear engaged in repeated and deliberate attempts to frustrate the resolution of the case on its merits. From the beginning Goodyear adopted a plan of making discovery as difficult as possible, providing only those documents it wished to provide, timing the production of a small subset of documents it was willing to turn over such that it was inordinately difficult for plaintiffs to manage their case and making false statements to the Court in an attempt to hide its behavior. The plan succeeded in making the case far more complicated than necessary requiring an absurd expenditure of resources by plaintiffs and the Court.

r.   Goodyear was engaged in a years' long course of misconduct.

s.   Goodyear believed discovery would consist of a game of hide-and-seek.

t.   The troubling behavior by Goodyear began almost immediately after the case was filed and continued throughout the entire litigation including during the sanction proceedings of 2011-2012.

u.   Goodyear was fully cognizant that it was not cooperating in discovery and was engaging in bad faith litigation behavior.

v.   Goodyear's corporate spokesperson's deposition could only be explained as consistent misrepresentations about available testing.

w.   Goodyear's outside counsel and its Legal Department were acting together making materially false and misleading statements in court and withholding documents they knew to be responsive to discovery requests.

x.   Goodyear and its attorneys adopted a strategy implemented to great effect, to resist all legitimate discovery, withhold obviously

1          relevant documents and allow plaintiffs and their experts to

2          operate under erroneous facts, disclose small subsets of

3          documents as late as possible and otherwise attempt to turn the

4          case based on a motor vehicle accident into an Arizona version of

5          Jarndyce and Jarndyce.

6     y.    Goodyear had a history of engaging in serious discovery

7          misconduct in every G159 case brought to the Court's attention.

8     46.    The Court's factual findings referenced in ¶¶ 45(a) through 45(y) were

9 all affirmed on appeal.

10     47.    Goodyear's deceptions constitute obstruction of justice pursuant to

11 18 U.S.C. § 1503 as they reflect Goodyear's corrupt endeavors to influence the

12 Federal Court and its endeavor to influence, obstruct or impede the due

13 administration of justice.

14     48.    Goodyear's acts as set forth in ¶¶ 45(a) through 45(y) reflect

15 Goodyear's serious misleading conduct with the intent to cause or induce the

16 withholding of documents from official proceedings or otherwise reflect Goodyear's

17 endeavor to conceal documents with the intent to impair their availability for use in

18 the judicial proceedings.

19     49.    Goodyear's acts as set forth in ¶¶ 45(a) through 45(y) reflect

20 Goodyear's corrupt concealment of records and its attempt to conceal records with

21 the intent to impair their availability for use in the judicial proceedings and otherwise

22 reflect conduct which obstructed, influenced or impeded the judicial proceedings.

23     50.    Goodyear is estopped from challenging the factual findings of the United

24 States District Court.

25     51.    The deceptions and prohibited endeavors of Goodyear set forth in

26 ¶¶ 45(a) through 45(y) document a part of Goodyear's scheme or artifice to defraud

27 the Court and plaintiffs and the associated conspiracy to engage in prohibited

28 criminal acts.

52.    Goodyear utilized the mails with each deceptive deposition, false or misleading filing and associated false declarations submitted to the courts and plaintiffs which are the subject to the District Court's factual findings.

53.    Plaintiffs reasonably relied upon Goodyear and its agents to obey statutes, professional mandates, court orders, court rules, rules of evidence, and upon representations to the Court by officers of the court and representatives made under oath by Goodyear's officers and agents.

54.    Prior to entering the sanction fee award, in 2013 Goodyear appealed that part of the November 2012 Order which required Goodyear to publish the Court's Order in every G159 case across the country.  The notice of appeal deprived the District Court of further jurisdiction and left various matters pending before the Court which would have to be addressed on remand, following the appeals.

55.    Though the Court documented frauds relating to test data, Goodyear's Legal Department knew it had repeatedly misled and was concealing a vast array of requested failure data and requested NHTSA documents from the Court and plaintiffs since 2006.   Goodyear was compelled to disclose these matters pursuant to applicable rules of procedure, Rules of Professional Responsibility and as a matter of law.   Rather than comply, Goodyear's deceptions facilitated the submission of an erroneous record for review by the appellate courts.

56.    The sanction fee award was thereafter entered and separately appealed, affirmed by the Ninth Circuit Court of Appeals and then partially reversed by the United States Supreme Court and ultimately remanded to the District Court in 2017.

57.    While *Haeger* I remained pending in the District Court, in May 2013, the Haegers filed a complaint in the Maricopa County Superior Court for fraud and abuse of process for the then-known varied acts of deception by Goodyear and its authorized agents and employees, which fraudulently induced the settlement of *Haeger* I, in accord with the District Court's instructions (*Haeger* II).

1    58.   The *Haeger* II Complaint sought damages for then-known frauds by
2 Goodyear, its employees and agents.

3    59.   Goodyear has been a litigant in the Arizona State Courts on multiple
4 occasions prior to *Haeger* II.  Goodyear's Legal Department was well familiar with its
5 disclosure and discovery obligations in Arizona state court cases before the
6 commencement of *Haeger* II, including in particular the disclosure mandates of Rule
7 26.1 A.R.C.P.

8    60.   Prior to the commencement of *Haeger* II, Goodyear well knew that it
9 had concealed, misrepresented or failed to disclose relevant and material information
10 that was critical to understanding Goodyear's liability for damages caused by its
11 defective G159 tire as well as its exposure for punitive damages and regulatory
12 penalties for its failure to comply with its statutory obligation to recall the G159 as a
13 defective tire which affected motor vehicle safety.

14    61.   Only Goodyear, its employees and agents knew what was being
15 concealed from Plaintiffs.

16    62.   Goodyear, its employees and agents knew that they had concealed
17 crucial evidence from Plaintiffs since the discovery commenced in *Haeger* I in
18 September 2006.

19    63.   Goodyear knew that it had failed to properly supplement and correct the
20 incomplete and misleading record during *Haeger* I regarding requested failure data
21 for the G159, related communications with NHTSA and other matters.  Goodyear
22 knew it needed to maintain those deceptions during *Haeger* II to avoid the discovery
23 of further deceptions directly related to the ongoing appeals and issues regarding the
24 due administration of justice in *Haeger* I, which Goodyear solely knew had been
25 obstructed for years.

26    64.   Only Goodyear, its employees and agents knew the full scope of that
27 deception and the existence of relevant evidence being concealed which Goodyear
28 was required to timely disclose.

Amended Complaint                                    - 16 -

1    65.    Goodyear, its employees and agents knew Plaintiffs were representing
2    the Haegers on a contingency fee basis in both *Haeger* I and *Haeger* II.

3    66.    Goodyear, its employees and agents knew that the continued
4    concealment, misrepresentation and nondisclosure of material relevant evidence
5    would cause Plaintiffs to incur thousands of hours of additional unnecessary expense,
6    retain additional law firms to assist with ever-expanding unnecessary work created
7    by Goodyear's scheme, cause loss of business opportunities and incur debt
8    associated with maintaining Plaintiffs' ongoing business pursuits in the years that
9    were to follow.

10    67.    Goodyear knew that the way it was handling *Haeger* I and *Haeger* II
11    would require Plaintiff David Kurtz to devote virtually all of his time acting as an
12    attorney in pursuit of Haeger-related litigation matters and its deceptions were
13    designed to financially exhaust Plaintiffs.

14    68.    Goodyear's acts and omissions directly interfered with Plaintiffs'
15    capacity to accept additional cases and caused a substantial loss of revenue through
16    its knowing and ongoing deceptions, damaging plaintiffs' property and business.

17    69.    Plaintiff David L. Kurtz's damages include the loss of meaningful
18    employment with his Professional Corporation, the loss of revenue consistent with
19    past years and the loss of employment opportunities.  The Professional Corporation
20    is solely owned by Plaintiff David L. Kurtz.  The wrongful acts of Goodyear destroyed
21    the value of this property as the historical sole source of employment and primary
22    source of earnings for Plaintiff David L. Kurtz.  The scheme further damaged plaintiffs
23    by causing plaintiffs to split fees from Haeger cases with other firms, the retention of
24    which would have been wholly unnecessary but for the wrongful acts of Goodyear
25    independently and as a part of its enterprise.

26    70.    Goodyear concealed and misrepresented the property damage claim
27    records that contained critical information revealing the defective nature of the G159

28

1   during *Haeger* I and for years during *Haeger* II, in various writings and oral

2   representations to the courts.

3        71.   Goodyear concealed and misrepresented its 2006 communications with

4   NHTSA that contained critical information revealing the defective nature of the G159

5   during *Haeger* I and for years during *Haeger* II, in various writings and oral

6   representations to the courts.

7        72.   Goodyear concealed and misrepresented the number of G159 tires sold

8   for use on motorhomes during *Haeger* I and for years during *Haeger* II in various

9   writings and oral representations to the court.

10       73.   Goodyear concealed and misrepresented injuries and death claims and

11  adjustments (warranty returns) regarding the G159 during *Haeger* I and for years

12  during *Haeger* II, in various writings and oral representations to the courts.

13       74.   Goodyear, its employees and agents knew the G159 was defective if it

14  was "subject to a significant number of failures in normal operation," and that the

15  defect determination could be based exclusively on the performance record of the

16  tire.   Goodyear, its employees and agents knew that crucial relevant evidence

17  included the failure rate of the tire, the failure rate of other Goodyear tires and the

18  importance of the tire to the safe operation of the vehicle, which had been effectively

19  concealed and/or misrepresented over the years.

20       75.   Prior to the commencement of *Haeger* I, Goodyear, its employees and

21  agents knew and concealed the failure data, injury and death claims, and NHTSA

22  communications regarding the G159.   Goodyear denied the G159 was defective in

23  every G159 case in the federal and state courts as part of its scheme.

24       76.   There have been at least 41 G159 lawsuits.   As part of its continuous

25  scheme, Goodyear, through its enterprise, has denied that the G159 is defective in

26  every state and federal case and endeavored to obstruct the due administration of

27  justice.

28

Amended Complaint                          - 18 -

77.   *Haeger* II began in May 2013.   Goodyear again corruptly denied the G159 was defective.

78.   Goodyear, its employees and agents were required to timely disclose relevant evidence pursuant to Rule 26.1, A.R.C.P. in *Haeger* II.   Goodyear, its employees and agents concealed the evidence which they were required to disclose and misrepresented its significance for a period of years.

79.   Goodyear, its employees and agents knew if the requested relevant information was disclosed, it would reveal the defective nature of the G159, a national fraud in other G159 cases, various fraudulent claims made in other prior Arizona G159 cases, frauds upon the Federal Government, a litany of further deceptive acts defrauding the Federal Court in *Haeger* I and render the *Haeger* II case indefensible.

80.   Goodyear filed its first disclosure statement in *Haeger* II on November 23, 2015.   Goodyear knowingly concealed, misrepresented or failed to disclose the lethal and highly relevant information which would reveal the defective nature of the G159 and Goodyear's historical deceptions.

81.   Such relevant information included adjustments and condition codes which would describe the cause of failure, the number of death and injury claims arising from G159 failures, the number of lawsuits filed arising from G159 failures, all property damage claim data which would reveal the date of loss, cause of failure, vehicle type and location of failure (front or rear), date of manufacture of the failed tire; the number of tires sold as original equipment on motorhomes, internal reports evaluating each failed tire and highly relevant long ago requested communications with the National Highway Traffic Safety Administration (NHTSA) which contained production and failure data disclosures relating to the G159.

82.   Goodyear's concealment prevented plaintiffs' discovery of how Goodyear had continuously been deceiving plaintiffs and the nature of their damage

Amended Complaint

- 19 -

1  claims against Goodyear, in spite of plaintiffs' continued due diligence over the years

2  in pursuing the facts.

3      83.    In spite of repeated requests in correspondence and in motion practice,

4  Goodyear never disclosed the relevant information until compelled to do so.   It

5  required multiple motions to compel before Goodyear was finally forthcoming with

6  the evidence which was required to be disclosed years prior.   In the interim,

7  *Haeger* II continued at tremendous unnecessary expense, further damaging

8  Plaintiffs' business and property.

9      84.    The various court orders compelled disclosure of such relevant

10  information in *Haeger* II over Goodyear's repeated objections, as all such data was

11  relevant to the punitive damage claims advanced in *Haeger* II.

12      85.    The G159 property damage claims submitted to Goodyear (damage

13  claims other than for the failed tire itself), are contained in various claim forms which

14  Goodyear requires each claimant to complete prior to consideration of the claim.

15  The claim forms include crucial relevant data, including but not limited to, the date of

16  loss, the date the claim was reported, the date the tire was manufactured, the

17  mileage on the vehicle, the model of vehicle, the make of vehicle and the location of

18  the tire failure on the vehicle, whether it be front or rear.   Those same property

19  damage claim forms maintained by Goodyear include the identification of the cause

20  of failure of each G159 tire.

21      86.    Goodyear's practices included the evaluation by Goodyear employees of

22  each tire which is the subject of a property damage claim.   Goodyear requires the

23  tires to be returned to Goodyear for analysis.   Goodyear prepares internal documents

24  which evaluate the cause of the failure for each tire returned to Goodyear in support

25  of a property damage, injury or death claim.   To this date, Goodyear has continued

26  to conceal all of its internal records which would further elaborate what Goodyear

27  knew internally and documented about each property damage, injury or death claim

28

Amended Complaint                              - 20 -

1 | involving a G159, as part of its ongoing scheme and in disregard of its disclosure

2 | obligations and court orders.

3 | 87.   Goodyear also kept track of all injury and death claims arising out of

4 | G159 failures.  Again, though requested for years, it was not until Goodyear was

5 | compelled by court order in *Haeger* II that Goodyear finally disclosed the injury and

6 | death claims arising out of G159 failures.

7 | 88.   It has always been Goodyear's duty as well as its practice to review

8 | adjustments, property damage, injury and death claims to discern trends in the

9 | claim data indicative of performance problems with the tire.  Goodyear's practice

10 | includes analysis of the number of tires manufactured, the number of tires failing,

11 | and analysis of when and how each tire failed as it relates to Goodyear's statutory

12 | required defect determinations.

13 | 89.   It was not until September 29, 2016, ten (10) years after first

14 | requested in *Haeger* I, that Goodyear finally disclosed what it claims to be the

15 | complete truth regarding its adjustment claim data.   Following court order in

16 | *Haeger* II, Goodyear ultimately disclosed the adjustment information which revealed

17 | 3,484 adjustments of the G159 tire. Each adjustment had a "condition code" which

18 | is a description of the cause of failure assigned to each tire by Goodyear through its

19 | employees.  It revealed the number of G159 tires which were returned as a result of

20 | tread separations and multiple other failure conditions, by year of production, long

21 | since concealed from Plaintiffs and significant evidence of the defective nature of the

22 | G159.

23 | 90.   It was not until September 29, 2016, ten (10) years after first

24 | requested in *Haeger* I, that Goodyear finally disclosed what it claims to be the truth

25 | about property damage, injury and death claims when it produced a summary list

26 | identifying the claim number, the claimant's name, the claimant's city and state of

27 | residency, the loss date, the report date, Department of Transportation Code

28 | embossed on each tire, the condition codes describing the cause of failure, the

1 | vehicle involved, the year the vehicle was manufactured and the make and model of

2 | the vehicle.

3 |     91.    The claim data revealed unprecedented property damage, injury and

4 | death claims for this limited production medium truck tire.  The data revealed

5 | failures vastly beyond that displayed by any other medium commercial truck tire

6 | during the history of manufacture of steel belted radial truck tires by any

7 | manufacturer.

8 |     92.    Goodyear knew that when this data was disclosed, it would highlight

9 | Goodyear's deceptions upon the Plaintiffs, other G159 litigants, victims, the Federal

10 | Government, the District Court in *Haeger* I and the appellate courts.

11 |     93.    The summary of property damage claim data described above revealed

12 | more than 600 such claims.  It revealed 90% of these claims were occurring on

13 | motorhomes traveling at highway speeds.  It revealed that these failures had

14 | involved at least 17 different motorhome manufacturers and 39 separate models of

15 | motorhomes.  These disclosures revealed that plaintiffs' original liability theories

16 | expressed in *Haeger* I in 2006, were entirely accurate.

17 |     94.    The disclosures included for the first time that there had been at least

18 | 98 injuries and deaths caused by G159 failures.  In 2018, plaintiffs discovered two

19 | other fatalities caused by G159 failures, which Goodyear had continued to conceal.

20 |     95.    The disclosures revealed at least 35 claims for property damage, injury

21 | or death involving Arizona residents.

22 |     96.    The disclosures revealed that Goodyear, its employees and agents had

23 | been concealing the same data when requested in other death cases arising from

24 | G159 failures filed in the Superior Courts of Pima and Maricopa County in 2005 and

25 | 2007.

26 |     97.    After being compelled to do so, in October 2016, Goodyear finally

27 | disclosed a partial production of the actual property damage claim forms (as opposed

28 | to the summary Goodyear disclosed in September 2016).  Although there had been

1  in excess of 600 property damage, injury or death claims arising from G159 failures,
2  Goodyear produced only 414 of the property damage claim files.  They excluded
3  Goodyear's internal report data which would detail its engineering analysis of each
4  failed tire submitted to Goodyear for review.

5      98.    The  414  property  damage  claims  revealed  crucial  long-concealed
6  liability evidence.

7      99.    Goodyear represented to the Federal Court in *Haeger* I and to Plaintiffs
8  that existing failure data regarding the G159 was primarily front end failures caused
9  by a weight imbalance on the front end of Fleetwood and Monaco motorhomes or as
10  a result of customer abuse.

11      100.    Goodyear misrepresented that the Fleetwood and Monaco failures were
12  "isolated incidents unique to the vehicles involved and did not indicate a universal
13  problem with this tire on all motorhomes."  Goodyear, its employees and agents had
14  failed to disclose, concealed and misrepresented the facts to the District Court and
15  Plaintiffs during *Haeger* I by not disclosing its knowledge that the G159 was failing
16  on at least 17 different motorhome makes and 39 separate models of motorhomes.
17  That deception continued in *Haeger* II until October 2016.

18      101.    The failure data finally disclosed in October 2016, revealed an almost
19  equal  number  of  front  and  rear  end  failures.   It  also  revealed  multiple  failures
20  occurring within a period of days or miles involving multiple G159 tires on the same
21  vehicle.   These  claim  records  also  revealed  that  all  accidents  were  occurring  at
22  highway speed.  All of this had been continuously concealed from the District Court
23  and plaintiffs throughout *Haeger* I and for years in *Haeger* II, despite Goodyear's
24  disclosure obligations.

25      102.    In *Haeger* I in August 2006, plaintiffs disclosed to Goodyear the theory
26  of liability was that the G159 was prone to heat-induced failures.  Because the G159
27  was designed as a stop-and-go pick-up and delivery tire for city use, that design
28  application  would  only  expose  the  tire  to  low  speed  utilization  with  regular

1  opportunities for the tire to cool.  When the G159 was placed on motorhomes, it was
2  exposed to continuous high speed use which generated heat beyond the design
3  limitations of the tire which led to its predictable tread separation.   The long
4  concealed and previously misrepresented property damage claim records finally
5  disclosed in October 2016 verified the universe of high speed failures of the G159
6  when used on motorhomes long known to Goodyear and concealed by the acts of its
7  employees and agents for more than a decade.

8      103.  The disclosures in late 2016 revealed the false representations by
9  Goodyear's employees and agents during *Haeger* I that there was no trend in
10 performance which was indicative of any problem, including on motorhomes
11 generally, with the G159 when such representations were knowingly false and
12 misleading.

13     104.  In September 2006 during *Haeger* I, plaintiffs asked Goodyear to
14 disclose the number of G159 tires sold as original equipment for motorhome use.
15 Goodyear, through the representations of its 30(b)(6) witness, Associate General
16 Counsel and its other agents denied any such data was available.

17     105.  Known only to Goodyear agents and employees, Goodyear had
18 disclosed to the National Highway Traffic Safety Administration (NHTSA), in response
19 to its April 2006 production demand, the number of G159 tires sold as original
20 equipment on motorhomes in May 2006, four (4) months prior to plaintiffs'
21 requested disclosure in *Haeger* I.

22     106.  On April 26, 2006, NHTSA, as part of its Office of Defect Investigation
23 regarding Country Coach motorhomes, compelled Goodyear to specify failure and
24 production information regarding the G159.  NHTSA advised Goodyear that it was
25 attempting to determine approximate failure rates of tires on the front end involving
26 motorhome applications versus other applications.   NHTSA compelled Goodyear
27 under threat of significant penalty to disclose its production and failure statistics.

28

Amended Complaint                                    - 24 -

107. On May 30, 2006, Goodyear submitted responsive information supported by affidavits alleging compliance with NHTSA's demands. The data produced allegedly included front end failure rates for the G159 when utilized on motorhomes and other applications. It also revealed the number of G159 tires sold as original equipment on motorhomes.

108. Goodyear's 2006 disclosure to NHTSA revealed that only approximately 34% of G159 tires were being sold for motorhome use, a highly relevant fact requested in 2006 by plaintiffs during *Haeger* I but concealed by Goodyear. The NHTSA communications were common knowledge between Goodyear's Legal Department, National Coordinating Counsel and local counsel in the G159 cases.

109. In December 2016, after being compelled by Court order to disclose the NHTSA data over Goodyear's corrupt deceptive objections, Goodyear finally and for the first time in any G159 case produced the information it provided to NHTSA in response to its production demand of April 2006. The same information had been requested to be disclosed by Goodyear to plaintiffs ten (10) years earlier, but was concealed by Goodyear through the acts of its employees and agents and was otherwise misrepresented in various filings, discovery hearings and testimony under oath.

110. In January 2017, plaintiffs verified with NHTSA that the information Goodyear disgorged was a complete response to NHTSA and its production demands of Goodyear.

111. The Goodyear submittals to NHTSA were riddled with deceptions as Goodyear concealed from the Federal Government the true failure statistics which NHTSA demanded Goodyear to disclose, defeating its regulatory function.

112. When the data was revealed to plaintiff, and added to the newly disclosed property damage injury and death claim information, it became immediately apparent that the G159 was the most dangerous steel-belted radial

1  truck tire ever manufactured, displaying failures on a parts per million basis which
2  were unprecedented in American tire manufacturing history.

3      113.  The newly disclosed property damage claim information, the actual
4  property damage claim forms, the deaths and injuries, the NHTSA disclosures and
5  other data finally revealed the historical Goodyear deceptions and fraud upon the
6  Federal Court in *Haeger* I; plaintiffs; victims; litigants; the public; and the
7  government.

8      114.  When it was finally discovered from Goodyear's disclosure to NHTSA
9  that only 34% of the G159 tires had been sold for motorhome use, it made the
10  failure data skyrocket when motorhome failures were isolated in the light of the
11  limited production statistics, rendering the defective G159 indefensible.  Instead of
12  approximately 600 property damage claims and 100 deaths and injuries caused out
13  of a population of 160,000 tires, it was discovered 90% of those claims arose from
14  failures on only approximately 50,000 tires sold for motorhome use.

15      115.  The new disclosures revealed that Goodyear had required plaintiffs to
16  incur more than a decade of time and expense unnecessarily and revealed that
17  Goodyear had knowingly and deceptively caused these business and property losses
18  and willfully inflicted emotional suffering upon Plaintiff, David Kurtz.

19      116.  Within days of the compelled disclosure of the liability damning data
20  submitted to NHTSA, Goodyear promptly endeavored to settle *Haeger* II and sought
21  to acquire a release for all claims from both the Haegers and plaintiffs.   The
22  determination to settle *Haeger* II was a decision solely reserved to the clients.   The
23  clients lacked the capacity to settle the plaintiffs' claims for the thousands of hours of
24  unnecessary time incurred, loss of business opportunities, unnecessary debt
25  incurred, property damage and emotional suffering knowingly caused by Goodyear.
26  Plaintiffs refused to include or release their claims in the *Haeger* settlement.   Rather,
27  the settlement was limited to the Haegers' claims which were or could have been
28  made in *Haeger* II.

117.   Goodyear knew that its actions had caused plaintiffs to suffer tremendous business and property damage losses by concealing requested relevant information for more than a decade.

118.   Goodyear knew that its settlement with the Haegers did not include the plaintiffs' business and property damage claims.

119.   Goodyear knew that plaintiffs intended to pursue additional fee claims on remand to the District Court in *Haeger* I for the newly discovered evidence of deception upon the Federal Court, plaintiffs and the Haegers, which had been ongoing for more than a decade, and Goodyear was informed that the value of plaintiffs' years of wasted time, exceeded the total sum paid by Goodyear to the Haegers to settle their injury claims.

120.   Plaintiffs' claims arising from Goodyear deceptions were thus agreed to be completely excluded from the settlement agreement between Goodyear and the Haegers and were expected to be addressed in the ongoing sanction proceedings in the Federal Court.

121.   On January 25, 2017, the Settlement Terms were agreed upon, in a written signed document.   The Agreement provided: "The Haeger Sanction Proceedings are not impacted by this settlement."

122.   The final Release contained an identical expression.   It also included a definition of the Sanction Proceedings that included the phrase "currently pending before the United States Supreme Court," as a statement of fact.

123.   During a telephone call with Goodyear's counsel on March 27, 2017, Plaintiff David Kurtz requested language be added to make clear that the phrase was not to be interpreted in any manner which restricted his ability to pursue additional fees and costs, as had been agreed.   Goodyear's counsel assured that such additional language was "totally unnecessary" as the phrase was "just trying to describe where the case is now."   In reliance upon Goodyear's representation, Plaintiff David Kurtz agreed the phrase could remain as a definition and not any form

1 of limitation.   Premised upon that understanding, the Agreement was signed by

2 Goodyear and the Haegers.

3       124.   *Haeger* I was remanded to the District Court on June 30, 2017.   Judge

4 Silver recused herself from further proceedings and the case was assigned to the

5 Honorable Murray Snow for further proceedings.

6       125.   When Plaintiffs sought further fees from the District Court in the

7 Haegers' Motion to Expand the Record, as a result of the discovery of vast previously

8 unknown deceptions, Goodyear lied to the Court that the phrase, "currently pending

9 before the United States Supreme Court," was a term of limitation which defeated

10 the Haegers' capacity to recover additional fees.

11       126.   In the same filing, Goodyear willfully misrepresented Judge Silver's

12 decisions in *Haeger* I which required production of property damage claims from

13 G159 failures to the Haegers in 2007 with which Goodyear failed to comply, in an

14 effort to further deceive the District Court.

15       127.   Goodyear   also   expressed   varied   deceptions   about   the   parties'

16 negotiations  and  the  purpose  of  expressions  contained  with  the  Settlement

17 Agreement.

18       128.   Goodyear's arguments were knowingly advanced in an endeavor to

19 obstruct justice.

20       129.   Goodyear knew its arguments were fraudulent and designed to deceive

21 the Court.

22       130.   Goodyear's deceptions were consistent with and part of its continuous

23 scheme to obstruct the due administration of justice.   Goodyear knew if it could

24 deceive the Court, it could hopefully evade millions of dollars of fee sanctions.

25       131.   Goodyear evaded responding to the Supplemental Statement of Facts

26 filed in Support of the Motion to Expand the Record to avoid any admissions.

27       132.   Goodyear sought to keep the Supplemental Statement of Facts sealed,

28 to keep any further disclosure regarding the defective nature of the G159 from public

1  view.   This effort was part of the same scheme to conceal the facts regarding the
2  G159 which commenced in 2003.

3      133.   The Court accepted Goodyear's fraudulent representations regarding the
4  meaning of the settlement agreement terms and denied plaintiffs' request on behalf
5  of the Haegers for further fees arising from the years of fraud only recently
6  discovered.   The court did not address nor rule upon plaintiffs' separate basis to
7  claim fees based upon plaintiffs' independent standing and damage as plaintiffs were
8  not a party to the *Haeger* I settlement agreement and plaintiffs' independent claims
9  for damages were not before the Court.

10     134.   Goodyear's knowing deceptions have caused and will continue to cause
11 unnecessary expenses and further damage to plaintiffs' business and property.

12     135.   The Court in *Haeger* II ruled that plaintiffs could disclose confidential
13 information from *Haeger* I and *Haeger* II to NHTSA, which was previously prohibited
14 under the secrecy protective order.   Following the Haegers' settlement of *Haeger* II
15 on July 10, 2017, plaintiffs disclosed the long-concealed information to NHTSA.   On
16 December 28, 2017, NHTSA opened its Defect Investigation as the result of the
17 disclosures, specifying that the number of claims suggest that the failures may stem
18 from a safety–related defect.   Goodyear's decade-long endeavor to conceal such
19 information from the government had finally been revealed.

20     136.   NHTSA's Defect Investigation public notice observed that it had not
21 previously had access to the failure data, injury and death claims as a result of
22 Goodyear's utilization of protective orders which prohibited disclosure by plaintiffs to
23 the Government.   In April 2018, NHTSA's Office of Defect Investigation sent 35
24 separate Information Requests to Goodyear, advising Goodyear that the failure to
25 fully respond could subject Goodyear to a maximum penalty of $105 million.   The
26 information sought included copies of all Goodyear internal reports evaluating each
27 tire which was the subject of a property damage, injury claim or lawsuit and

28

Amended Complaint                          - 29 -

1   demanded Goodyear disclose its assessment of alleged defects, including comparison
2   of the property damage claim rates of the G159 with other tires.

3       137.  Goodyear demanded that Plaintiffs' July 10, 2017 letter and the
4   thousands of pages of supporting documents be kept from public view, as part of its
5   continuous scheme.

6       138.  Goodyear demanded that its responses to NHTSA's 2018 inquiries too
7   be kept from public view, as part of its continuous scheme.

8       139.  Both Goodyear and NHTSA knew that Goodyear evaluated trends of
9   failure data on a parts per million basis.   The NHTSA communications which
10  Goodyear hopes to keep from public view contain all the failure data that reveals the
11  defective nature of the G159.

12      140.  Both Goodyear and NHTSA knew that Goodyear's parts per million
13  failure data for tires other than the G159 had been previously studied by NHTSA in
14  conjunction with its evaluation of recalled Firestone tires.  NHTSA had performed a
15  peer comparison of the failure rates of Firestone tires with similar tires of Goodyear.
16  The recalled Firestone tires had disclosed an average failure claim rate of
17  approximately 229 parts per million.  The Goodyear peer tire had displayed a claim
18  failure rate of 0 to 10 parts per million.   The data plaintiffs disclosed to NHTSA
19  revealed a parts per million claim rate for the G159 that was in excess of 10,000
20  ppm; a thousand times worse than the Goodyear tires previously studied by NHTSA.

21      141.  NHTSA and Goodyear were also familiar with Goodyear's prior disclosure
22  of injury and death claims arising out of Goodyear's Wrangler tires used on Ford
23  Explorers, which were contrasted with the Firestone recalled tires at issue, which too
24  were utilized on Ford Explorers.  The Goodyear Wrangler RTS tire had zero death or
25  injury claims arising out of the 2,872,808 tires sold.

26      142.  The G159 displayed 100 death and injury claims out of 160,683 tires.

27      143.  As was observed by the Court in *Haeger* II in 2018, the failure data
28  considered collectively affords key insight into design issues regarding the G159

1   because it allows the manufacturer to correlate tire failures with particular
2   applications such as the use of the G159 on motorhomes.   The Court also found that
3   Goodyear arguably used protective orders dishonestly to gain an unwarranted
4   advantage in litigation and to avoid tort liability.

5          144.   In 2018, the Court in *Haeger* II observed that the G159 personal injury
6   and property damage claims can be interpreted to suggest the G159 is dangerous
7   and that Goodyear's nondisclosure was merely damage control and the interest it
8   was protecting was not competitive advantage but rather avoiding bad publicity and
9   potential liability.

10         145.   Goodyear's scheme to conceal all information which reveals the
11  defective nature of the G159 has been continuous between 2003 through 2018,
12  including its use of outside counsel to assist in its deceptions and the use of
13  witnesses willing to lie under oath.

14         146.   All the deceptions during *Haeger* II were directly related to the ongoing
15  proceedings in *Haeger* I and Goodyear's endeavors to continuously deceive the
16  Federal Court.

17         147.   If Goodyear admitted, through any witness, that the G159 was
18  defective, its entire scheme would unravel with devastating consequences for
19  admitted continuous deceptions throughout *Haeger* I and related frauds upon the
20  government.

21         148.   To protect Goodyear's "best interests," Goodyear General Counsel David
22  Bialosky, lied about his knowledge regarding property damage and injury claims for
23  the G159 and the standard for when a product is deemed defective during his
24  deposition in *Haeger* II, which was taken remotely with the witness in Ohio and
25  counsel in Arizona.

26         149.   To protect Goodyear's "best interests," Goodyear's General Counsel
27  Tom Harvie acknowledged he knew the number of property damage, injury and
28  death claims regarding the G159 and lied that Goodyear was not required to disclose

1  such data to NHTSA because neither he nor anyone else at Goodyear was personally

2  concerned about the failures when he was deposed in Ohio by counsel in Arizona

3  during *Haeger* II.

4      150.  To protect Goodyear's "best interests," Goodyear's Director of Global

5  Government Compliance and Product Performance lied that the G159 property

6  damage, death and injury claims did not suggest there was a performance problem

7  with the G159, not knowing that within months thereafter NHTSA would directly

8  impeach this claim.  This deposition too was taken remotely with the witness in Ohio

9  and counsel in Arizona during *Haeger* II.

10     151.  To protect Goodyear's "best interests," Goodyear's 30(b)(6) witness lied

11  in Federal Court proceedings in Florida about the temperature limitations of the G159

12  and the related tests regarding durability.

13     152.  In every G159 case in the federal and state courts, Goodyear denied

14  that the G159 was defective and utilized its in-house employee witnesses to advance

15  the same deception, year after year.

16     153.  In the Arizona State court cases, Goodyear concealed the test and true

17  failure data regarding the G159 and all damning admissions by *Haeger* I Goodyear

18  witnesses to advance its deceptive claims that the G159 was not defective as part of

19  its continuous scheme.

20     154.  In the Arizona State court cases, as in *Haeger* I, Goodyear concealed

21  the NHTSA documents from 2006 to advance its deception that the G159 was not

22  defective.

23     155.  As part of its continuous scheme and to protect its best interests

24  between 2007 to 2018, Goodyear has repeatedly misrepresented the safety of the

25  G159 in its wire or mail press releases or responses to journalists who have regularly

26  repeated these deceptive claims to the public.  Goodyear has repeated these same

27  deceptive claims to NHTSA as a part of its continuous scheme by use of wire or mail.

28

156.   In *Haeger* I, Goodyear had an ongoing duty to supplement discovery responses and disclosures pursuant to Court order or when they were materially incomplete or incorrect and to otherwise correct false statements of fact.  That duty has been continuous since 2006 and continues until the conclusion of the proceedings in *Haeger* I, which remain ongoing.

157.   If Goodyear had complied with these obligations, all of the information which Goodyear was compelled to disclose in 2016 would have been disclosed in 2006 and rendered *Haeger* II wholly unnecessary.  Upon such complete disclosure, Goodyear would have opted to resolve the Haegers' claims then, as it did in 2016, and all the expenses, losses and emotional suffering by plaintiffs would not have occurred.

158.   Those disclosures would have changed the entire legal landscape and the appellate proceedings would have been unnecessary.

159.   Because Goodyear failed to comply with these obligations, plaintiffs were forced to incur years of unnecessary expenses associated with the appeals which were based upon a false and incomplete record.

160.   Goodyear's Board of Directors has been fully informed of the corrupt scheme implemented by Goodyear's Legal Department and its enterprise and is aware of all failure data, death and injury claims, the ongoing efforts to deceive NHTSA, the public and the Federal Court in *Haeger* I.  The Board has been informed of the criminal nature of Goodyear's actions including obstruction of justice, wire and mail fraud.  The Board is fully informed as to the damage done to Plaintiffs' business and property.   The Board has ratified each corrupt act and the ongoing frauds, cognizant that the Goodyear scheme is ongoing.

## COUNT ONE – RICO Claims

161.   The allegations of ¶¶ 1 through 160 are incorporated herein by this reference.

1      162.   Goodyear was a part of the above-described enterprise engaged in and

2  whose activities affected interstate commerce.

3      163.   Goodyear agreed to and did conduct and participated in conduct of the

4  enterprise and its affairs through a pattern of racketeering activity that has damaged

5  the Plaintiffs' business and property.

6      164.   Pursuant to and in furtherance of its fraudulent scheme, Defendant

7  committed multiple related acts of continuous prohibited criminal activities which

8  constitute racketeering activity pursuant to 18 U.S.C. §1961(1), (3), (4) and (5).

9      165.   For the purpose of executing such scheme or attempting to do so,

10  Goodyear has utilized the mails and wires, communicating in interstate commerce in

11  violation of 18 U.S.C. § 1341 and § 1343.

12      166.   Goodyear has corruptly endeavored to influence the courts of the United

13  States as part of its scheme or artifice to defraud and has corruptly influenced,

14  obstructed, impeded or endeavored to influence, obstruct or impede the due

15  administration of justice in violation of 18 U.S.C. § 1503(a).

16      167.   Goodyear has corruptly persuaded another person, or attempted to do

17  so, or engaged in misleading conduct towards another person with the intent to

18  cause or induce such person to withhold testimony or withhold a record, document or

19  other object from official proceedings in violation of 18 U.S.C. §1512(b)(2)(A).

20      168.   Goodyear has corruptly persuaded another person, or attempted to do

21  so, or engaged in misleading conduct toward another person with the intent to

22  conceal an object with intent to impair the objects availability for use in official

23  proceedings in violation of 18 U.S.C. § 1512(b)(2)(B).

24      169.   Goodyear has corruptly concealed records or attempted to conceal

25  records with the intent to impair their availability for use in official proceedings and

26  otherwise obstructed, influenced or impeded official proceedings or attempted to do

27  so in violation of 18 U.S.C. § 1512(c)(1) and (2).

28

Amended Complaint                              - 34 -

1    170.   The acts set forth within the body of the complaint constitute a pattern

2   of racketeering activity pursuant to 18 U.S.C. § 1961(5).

3    171.   Goodyear has directly or indirectly conducted and participated in the

4   conduct of the enterprise affairs through a pattern of racketeering activity described

5   above in violation of 18 U.S.C. § 1962(c).

6    172.   As a direct and proximate result of Defendant's racketeering activities in

7   violation of 18 U.S.C. § 1962(c), plaintiffs have been injured in their business and

8   property.

9    173.   Wherefore plaintiffs request this Court enter a judgment against

10   Defendant Goodyear for damages caused to plaintiffs' business and property, treble

11   damages and an award of attorney's fees and costs in accord with 18 U.S.C. §

12   1964(C).

13                          **COUNT TWO – RICO Conspiracy**

14    174.   Plaintiffs incorporate the preceding allegations in ¶¶ 1-173.

15    175.   Goodyear has been associated with the described enterprise engaged in,

16   or the activities of which affect interstate commerce.

17    176.   Goodyear and members of the enterprise have conspired to violate 18

18   U.S.C. § 1962 (c).

19    177.   Goodyear was aware of the essential nature and scope of the enterprise

20   and intended to and agreed to participate in it.   Goodyear intended to further

21   endeavors which, if completed, would constitute criminal offenses contemplated by

22   18 U.S.C. § 1961 as racketeering activity and agreed that members of the enterprise

23   would commit multiple prohibited criminal acts which would constitute racketeering

24   activities as defined in 18 U.S.C. § 1961(1).

25    178.   Goodyear separately conspired with its own officers and representatives

26   to violate 18 U.S.C. § 1962 (c).

27

28

1    179.   Goodyear knowingly and willfully became a member of each conspiracy
2  and  overt  acts  in  furtherance  of  such  conspiracies,  as  prohibited  by  18  U.S.C.
3  § 1961(1), have occurred for which Goodyear is responsible.

4    180.   The conspiracies have damaged the Plaintiffs' business and property
5  entitling Plaintiffs to an award of treble damages, costs and reasonable attorney fees
6  pursuant to 18 U.S.C. 1964 (c).

7                          **COUNT THREE – Fraudulent Misrepresentation**

8    181.   Plaintiffs incorporate the preceding allegations in ¶¶ 1-180.

9    182.   Goodyear, its employees and agents made misrepresentations for the
10 purpose of inducing the plaintiffs to act or refrain from action in reliance upon these
11 representations.  Each of the representations was false and material.  Goodyear, its
12 employees  and  agents  knew  the  falsity  of  such  representations  or  were  otherwise
13 ignorant  of  their  truth.      Goodyear  its  employees  and  agents  intended  the
14 misrepresentations to be acted upon by the plaintiffs.  The plaintiffs were ignorant of
15 the falsity of the representations and relied upon the truth of such representations.
16 Plaintiffs had the right to rely upon the truth of such representations.

17    183.   As  a  result  of  plaintiffs'  reliance,  plaintiffs  have  been  proximately
18 injured.

19    184.   As  the  result  of  these  material  misrepresentations  plaintiffs  have
20 suffered damage to their business and property.

21    185.   Plaintiffs are entitled to damages caused by the fraud of Goodyear, its
22 employees and agents, and for Plaintiff David L. Kurtz's emotional suffering.

23    186.   Plaintiffs are entitled to an award of punitive damages.

24    187.   Plaintiffs are entitled to their costs.

25                          **COUNT FOUR – Fraudulent Non-Disclosure**

26    188.   Plaintiffs incorporate the preceding allegations in ¶¶ 1-187.

27

28

189.   Goodyear, its employees and agents failed to disclose to plaintiffs, facts which they knew would justifiably induce the plaintiffs to act or refrain from acting in conjunction with the *Haeger* I, *Haeger* II litigation and in *Haeger* I appeals.

190.   Goodyear, its employees and agents had a duty to plaintiffs to exercise reasonable care to disclose matters concealed from the plaintiffs years prior to when the information was ultimately compelled to be disclosed.

191.   Goodyear, its employees and agents knew that the failure to disclose matters previously concealed and misrepresented was necessary to prevent statements provided to the plaintiffs from being misleading.

192.   Goodyear, its employees and agents knew that absent further timely and complete disclosure, the plaintiffs would continuously incur thousands of unnecessary hours of work, lost opportunities and associated expenses, including emotional suffering, all of which would have been unnecessary had Goodyear been forthcoming and complied with its obligations.

193.   Goodyear's non-disclosures, through its employees and agents were either false or created a false impression, were material and Goodyear, its employees and agents knew of the falsity of such representations or the materially misleading nature of their omissions.

194.   Goodyear, its employees and agents intended that the misrepresentations and/or omissions should be acted upon by the plaintiffs.   The plaintiffs were ignorant of the falsity of the representations and unaware of the nature of the material omissions and relied upon the truth of Goodyear's prior representations and its obligation to be forthcoming with its disclosure obligations. Plaintiffs had the right to rely upon the truth of such representations.

195.   As a result of plaintiffs' reliance, plaintiffs have been proximately injured in a manner previously described.

196.   Plaintiffs are entitled to an award of punitive damages.

197.   Plaintiffs are entitled to an award of their costs.

**COUNT FIVE – Fraudulent Concealment**

198. The plaintiffs incorporate the preceding allegations in ¶¶ 1-197.

199. Goodyear through its employees and agents, by concealment, intentionally prevented plaintiffs from timely acquiring material information.

200. The concealment of material information caused a pecuniary loss to the plaintiffs.

201. Goodyear through its employees and agents intentionally prevented the plaintiffs from learning of the material facts that were significant in a timely fashion to their damage.

202. Goodyear's deceptive acts were intended to hide information, mislead, avoid suspicion and prevent further inquiry into material matters.

203. Goodyear through its employees and agents actively concealed material facts by words or acts which created a false impression, covering up the truth, including false denials of knowledge by Goodyear, its employees and agents, who were in possession of the facts.

204. As a result of Goodyear's acts through its employees and agents, plaintiffs have been proximately injured in an amount to be proven at trial.

205. As a result of these material misrepresentations, plaintiffs were deceived resulting in past and future damage to their business and property, lost opportunities, emotional damage and debt.

206. Plaintiffs are entitled to an award of punitive damages.

207. Plaintiffs are entitled to an award of their costs.

**COUNT SIX –Abuse of Process**

208. Plaintiffs incorporate the preceding allegations in ¶¶ 1-207.

209. Goodyear, its employees and agents willfully utilized judicial process for purposes not proper in the regular conduct of the proceedings.

210. Goodyear, its employees and agents utilized process in Haeger-related litigation for illegitimate purposes, including misleading filings, purposely deceptive

1 pleadings, obstructing access to evidence which required disclosure pursuant to
2 applicable rules of procedure, testifying falsely, knowingly making false statements
3 of facts to the Court, failing to correct false statements of facts previously made to
4 the Court, knowingly offering evidence which Goodyear knew to be false, knowingly
5 engaging in fraudulent conduct relating to the judicial process and failing to timely
6 take remedial measures, including disclosure to the court and plaintiffs, all of which
7 was prohibited and prejudicial to the administration of justice.

8      211.  Goodyear's acts through its employees and agents were undertaken for
9 improper purposes and utilized the process for purposes for which it was never
10 intended.

11      212.  Goodyear, its employees and agents caused the plaintiff David L. Kurtz
12 to suffer emotional distress, inconvenience, anxiety and frustration to his damage.

13      213.  Goodyear, its employees and agents caused damage to plaintiffs'
14 business and property interests.

15      214.  Plaintiffs are entitled to an award of punitive damage.

16      215.  Plaintiffs are entitled to an award of their costs.

17                 **COUNT SEVEN – Aiding and Abetting**

18      216.  Plaintiffs incorporate the preceding allegations in ¶¶ 1-215.

19      217.  Goodyear and its employees substantially aided Goodyear's outside
20 counsel which appeared on its behalf in *Haeger* I and *Haeger* II to commit wrongful
21 and prohibited conduct which damaged the plaintiffs' business and property
22 interests, including fraudulent misrepresentations, fraudulent non-disclosure,
23 fraudulent concealment and abuse of process.

24      218.  Plaintiffs are entitled to an award of punitive damages.

25      219.  Plaintiffs are entitled to an award of their costs.

26     **COUNT EIGHT – Intentional Interference with Business Expectancy**

27      220.  Plaintiffs incorporate the preceding allegations in ¶¶ 1-219.

28

Amended Complaint                            - 39 -

221.   Plaintiffs had a valid contract and associated business expectancy with the Haegers prior to the commencement of *Haeger* I in 2005 and *Haeger* II in 2013 and during the years that the cases continued.

222.   Goodyear knew of the contractual relationship between plaintiffs and the Haegers.

223.   Goodyear improperly and intentionally interfered with plaintiffs' contracts and business expectancies.

224.   Goodyear knew its improper actions would cause damage and disruption to plaintiffs' business expectancy.

225.   Goodyear's improper actions made plaintiffs' contractual performance vastly more expensive and burdensome than it would have been but for Goodyear's improper conduct and subjected plaintiffs to substantial financial losses as a result of Goodyear's acts which interfered and prevented plaintiffs' effective performance of its contract with the Haegers.

226.   Plaintiffs are entitled to damages caused by Goodyear's improper acts.

227.   Plaintiffs are entitled to an award of punitive damages.

228.   Plaintiffs are entitled to an aware of their costs.

WHEREFORE, Plaintiffs request that the Court enter its Order:

A.     Awarding Plaintiffs their damages incurred as a result of the wrongful acts and omissions of Goodyear through its employees and agents;

B.     Trebling damages caused by Goodyear's acts of racketeering.

C.     Awarding punitive damages in an amount sufficient to punish and deter Goodyear for its willful, outrageous and evil misconduct.

D.     Awarding attorney fees and costs, as the Court deems appropriate.

1      DATED this 31st day of December, 2018.

2                   THE KURTZ LAW FIRM

3

4                By:___/s/  David L. Kurtz_____
                  David L. Kurtz

5                  7420 East Pinnacle Peak Road, Suite 128
                  Scottsdale, AZ    85255

6                  *Attorney for Plaintiff*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Amended Complaint                  - 41 -

# EXHIBIT 2

**Lewis Roca Rothgerber Christie LLP**
201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

**Foster Robberson** (State Bar No. 005939)
Direct Dial: 602.262.5795
Direct Fax: 602.734.3856
Email:  frobberson@lrrc.com

**Jared L. Sutton** (State Bar No. 028887)
Direct Dial: 602.262.0259
Direct Fax: 602.734.3924
Email:  jsutton@lrrc.com

Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| David L. Kurtz, individually and as President of David L. Kurtz, P.C. doing business as The Kurtz Law Firm,<br><br>                              Plaintiff,<br><br>        vs.<br><br>The Goodyear Tire & Rubber Company, an Ohio corporation,<br><br>                              Defendant. | No.<br><br>**DECLARATION OF JARED SUTTON IN SUPPORT OF GOODYEAR'S NOTICE OF REMOVAL** |

I, Jared L. Sutton, declare as follows:

1.       I am an attorney at the law firm of Lewis Roca Rothgerber Christie LLP.  I represent The Goodyear Tire & Rubber Company ("Goodyear") in this matter.  I am over the age of 18 and am competent to testify regarding the matters in this declaration.

2.       On or about January 3, 2019, under my supervision, administrative assistant Patty Vejar ordered, received, and copied all filings in *David L. Kurtz v. The Goodyear Tire & Rubber Company*, pending in the Arizona Superior Court, County of Maricopa, Case No. CV2018-053331 (the "State Court Action").

3.       Exhibit 1, with subparts (A)-(F), consists of true and complete copies of all pleadings and other documents filed in the State Court Action.

4.      I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 9th day of January, 2019.

_____
Jared L. Sutton

# EXHIBIT 3

Skip To MainContent

[                    ] [ Search ]

Civil Court Case Information - Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2018-053331 | Judge: | Cohen, Bruce |
| File Date: | 10/1/2018 | Location: | Northeast |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| David L Kurtz | Plaintiff | Male | David Kurtz |
| Goodyear Tire & Rubber Company, The | Defendant | | Pro Per |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 12/31/2018 | AMC - Amended Complaint | 12/31/2018 | |
| **NOTE:** AMENDED COMPLAINT | | | |
| 12/5/2018 | 322 - ME: Notice Of Intent To Dismiss | 12/5/2018 | |
| 10/1/2018 | COM - Complaint | 10/4/2018 | |
| 10/1/2018 | CCN - Cert Arbitration - Not Subject | 10/4/2018 | |
| 10/1/2018 | CSH - Coversheet | 10/4/2018 | |
| 10/1/2018 | NJT - Not Demand For Jury Trials | 10/4/2018 | |

## Case Calendar

**There are no calendar events on file**

## Judgments

**There are no judgments on file**